NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2022 VT 45

No. 2021-173

| Huntington Ingalls Industries, Inc. et al. | Supreme Court |
|---|---|
| v. | On Appeal from Superior Court, Franklin Unit, Civil Division |
| Ace American Insurance Company et al. | January Term, 2022 |

Robert A. Mello, J.

Erin Miller Heins and Vincent J. Todd of Langrock Sperry & Wool, LLP, Burlington, and Kirk Pasich, Sandra Smith Thayer, Pamela Woods and Christopher Pasich of Pasich LLP, Los Angeles, California, for Plaintiffs-Appellants.

Nolan C. Burkhouse and Megan A. Sigur of Paul Frank + Collins P.C., Burlington, for Defendants-Appellees.

Costantino Suriano of Mound Cotton Wollan & Greengrass LLP, New York, New York, for Defendants-Appellees Starr Surplus Lines Insurance Company, Tokio Marine America Insurance Company, HDI Global SE, and Lancashire Insurance Company (UK) Limited, LIRMA 10205.

Peter Kanaris and Cheryl L. Mondi of Hinshaw & Culbertson LLP, Chicago, Illinois, for Defendant-Appellee Berkshire Hathaway Specialty Insurance Company.

Wayne Glaubinger and Jared Markowitz of Mound Cotton Wollan & Greengrass LLP, New York, New York, for Defendants-Appellees Lex-London and Zurich American Insurance Company.

Brett Ingerman of DLA Piper LLP (US), Baltimore, Maryland, and Brett Solberg of DLA Piper LLP, Houston, Texas, for Defendant-Appellee Interstate Fire and Casualty Co.

Seth V. Jackson, Farmington, Massachusetts, and Matthew Gonzalez, New York, New York, of Zelle LLP, for Defendants-Appellees XL Insurance America and SCOR SE.

Matthew C. Ferlazzo and Courtney E. Murphy of Hinshaw & Culbertson, LLP, New York, New York, for Defendants-Appellees Lloyd's Underwriter Syndicates (Nos. 1414 ASC, 0510 KLN, 1880 TMKS, 1967 WRB, 0623, 2623, 0033 HIS, 2987 BRIT, 4000 HAM, 1036 COF, 2791 MAP, 1200 AMA), Chubb Global Markets Property LIRMA A2302, Beazley Property Consortium 95892020, Hamilton Insurance DAC, Partner Reinsurance Europe SE, and Houston Casualty Company (UK Branch), LIRMA H5100.

Kristin Gallagher and Eduardo DeMarco of Kennedys, Basking Ridge, New Jersey, for Defendant-Appellee Axis Reinsurance Co.

Aidan M. McCormack of DLA Piper LLP, New York, New York, for Defendant-Appellee Westport Insurance Corporation.

Jonathan M. Freiman, New Haven, Connecticut, and Anjali S. Dalal, New York, New York, of Wiggin and Dana LLP, and John Kavanagh of Steptoe & Johnson LLP, Washington, D.C., for Defendant-Appellee Lloyd's Underwriter Syndicate No. 1221 HIG.

Jeffrey R. Babbin of Wiggin and Dana LLP, New Haven, Connecticut, for Defendant-Appellee Zurich American Insurance Company.

Robert W. Fisher, Atlanta, Georgia, and William Cooney, New York, New York, of Clyde & Co. US LLP, for Defendants-Appellees Ace American Insurance Company, Endurance Assurance Corporation, and Aspen Specialty Insurance Company.

Ritchie E. Berger and Justin B. Barnard of Dinse P.C., Burlington, for Amicus Curiae American Property Casualty Insurance Association.

Marshall Gilinsky of Anderson Kill PC, New York, New York, for Amicus Curiae United Policyholders.

PRESENT:  Reiber, C.J., Eaton and Carroll, JJ., and Johnson, J. (Ret.), and Bent, Supr. J. (Ret.), Specially Assigned


¶ 1.    **EATON, J.**   Insured Huntington Ingalls Industries, Inc. and insurer Huntington Ingalls Industries Risk Management LLC seek a declaratory judgment stating there is coverage under a property insurance policy for certain losses incurred by Huntington Ingalls Industries due to the COVID-19 pandemic.  The trial court concluded that the complaint did not allege facts that would trigger coverage under the policy and granted judgment on the pleadings in favor of reinsurers.  We reverse.

2

¶ 2.    The following facts are as stated in insured's complaint and accompanying exhibits.[1]  Insured, Huntington Ingalls Industries, Inc., is the largest military shipbuilding company in the United States and provides professional services to government and industry partners.  It employs over 42,000 people, the majority of whom work at its shipyards in Virginia and Mississippi.

¶ 3.    In March 2020, insured purchased a property insurance policy (Global Policy) from insurer Huntington Ingalls Industries Risk Management LLC, its captive insurance subsidiary and a Vermont corporation.  The policy covers the period of March 15, 2020, to March 15, 2021.  That same month, insurer purchased policies from multiple reinsurers to reinsure all its obligations to insured under the Global policy.  Each reinsurer participated for a specified percentage of the reinsurance program.  Reinsurers' policies incorporate the Global Policy by reference, stating for example that their liability "shall attach simultaneously with that of [insurer] and shall be subject in all respects to the same risks, terms, conditions, rates, interpretations[,] and waivers" of the underlying policy issued to insured.[2]

¶ 4.    The policy, titled "Global Property Insurance," contains the following relevant provisions.  It insures "[a]ll real and personal property" and "against all risks of direct physical loss or damage to property."  In the "business interruption" clause, it covers "[l]oss due to the necessary interruption of business conducted by [insured], whether total or partial . . . caused by physical loss or damage insured herein."  Recovery under the business-interruption provision is limited to the extent that insured is

---

[1] When a complaint relies upon a document, that document "merges into the pleadings." Kaplan v. Morgan Stanley & Co., 2009 VT 78, ¶ 10 n.4, 186 Vt. 605, 987 A.2d 258 (mem.) (quotation omitted).

[2] Because reinsurers' policies incorporate the Global Policy by reference, this opinion hereinafter uses the policy in the singular for the sake of clarity.

3

(a) wholly or partially unable to produce goods or continue normal business operations or services during the [p]eriod of [r]ecovery; (b) unable to make up lost production within a reasonable period of time . . . ; or (c) able to demonstrate a loss or reduction of Net Profit for the services or production prevented, impaired or interrupted.[3]

The period of recovery begins on "the date of . . . loss or damage" and "[s]hall not exceed such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair, or replace the property that has been destroyed or damaged." The period of recovery also includes "[s]uch additional length of time to restore [insured's] business to the condition that would have existed had no loss occurred."

¶ 5.    In what is referred to as the mitigation clause, the policy requires insured to "make every reasonable effort to reduce" business-interruption losses and insures "such necessary and reasonable expenses incurred for the purpose of reducing any loss." It also "covers the costs incurred for actions to temporarily protect or preserve insured property, provided such actions are reasonable and necessary due to actual, or to prevent threatened, insured physical loss or damage to such insured property."

¶ 6.    The policy provides that Vermont law governs its construction. Neither the Global Policy nor any of the reinsurance policies defines "direct physical loss or damage to property." The policy does not contain any clause expressly excluding pandemic-related loss or damage. The insurance industry has a standard-form virus exclusion that has been available since 2006, which was not included in any of these insurers' policies.

¶ 7.    SARS-CoV-2 is a virus that causes the disease COVID-19. First reported cases were diagnosed in December 2019, and the virus and disease have since spread throughout the world, resulting in a global pandemic. In March 2020, civil authorities across the United States

---

[3]    The policy also covers "[a]ny reasonable and necessary [extra expense] incurred . . . following physical loss or damage insured herein" and defines extra expense as "the excess (if any) of the total cost incurred during the [p]eriod of [r]ecovery chargeable to the operation of [insured's] business."

4

began to issue orders requiring certain businesses to close and recommending people stay home to reduce the virus's spread. Civil orders generally required businesses to adhere to social distancing, employ enhanced sanitization practices on surfaces, and follow recommendations from the Centers for Disease Control and Prevention (CDC) and state health departments. However, they allowed businesses to operate at a level needed to provide essential services.

¶ 8. On March 19, 2020, the federal government designated sixteen sectors as "Essential Critical Infrastructure" during the pandemic. Insured is part of the Defense Industrial Base, a critical infrastructure sector. In a March 20, 2020, memorandum, the Undersecretary of Defense told the critical infrastructure industry that they "have a special responsibility to maintain [their] normal work schedule" and that they should follow CDC and state and local government guidelines to limit spread of the virus.

¶ 9. Accordingly, insured kept its shipyards open but made changes to its operations to comply with CDC guidance and protect employees. These changes included modifying and staggering work to reduce crowding and achieve social distancing, sanitizing and cleaning at its facilities, and placing physical barriers to restrict virus transmission. Insured implemented policies requiring employees who tested positive for COVID-19 to isolate and not return to work until CDC quarantine recommendations were satisfied and employees who had close contacts with someone who tested positive to self-quarantine for fourteen days or until cleared through testing. As a result of the presence of COVID-19, insured's shipyards "were and are not capable of performing their essential functions at their intended capacities."

¶ 10. On March 22, 2020, the first of insured's shipyard employees tested positive for COVID-19. As of September 2020, over 1000 positive tests were reported from insured's shipbuilding facilities. By April 28, 2021, this number increased to over 6000. Employees first experienced symptoms while at work or were present at the shipyard within forty-eight hours

5

before first experiencing symptoms. During these times, they were infectious. COVID-19 has been continuously present at the shipyards since March 2020.

¶ 11. The virus is spread to the surrounding air in the form of droplets released when an infected person breathes, coughs, sneezes, or speaks. The infected droplets can travel significant distances and stay in the air for several hours. Gravity causes these droplets to eventually fall on and adhere to nearby surfaces; when this occurs, the surface is called a "fomite." The presence of a virus on a surface can spread the virus to humans when people touch that surface then touch their eyes, noses, or mouths before cleaning their hands. According to some studies, a surface can remain a source of transmission for the virus for up to six days, or even up to seventeen days, depending on the conditions.

¶ 12. In September 2020, insured and insurer sued reinsurers seeking a declaratory judgment that they are entitled to coverage under the policy for property damage, business interruption, and other losses suffered as a result of SARS-CoV-2, the pandemic, and civil authority orders.[4] The complaint alleges the pandemic caused "direct physical loss or damage to property" when the virus adhered to surfaces for several days and lingered in the air for several hours at the shipbuilding yards. The alleged losses include disruption in orderly construction and repair of vessels, schedule impacts in the construction and repair of vessels, expenses—including increased labor and information technology costs—incurred to continue as near to normal operations as practicable, loss of profit caused by the change in labor volume, and other time-element losses.[5]

---

[4] For clarity, insured and insurer are treated as one, and the opinion hereinafter refers to insured in the singular when discussing both plaintiffs' actions.

[5] The complaint recites several other coverage provisions for contingent business interruption and contingent extra expense, interruption by civil or military authority, and ingress or egress. Reinsurers propose that the trial court implicitly ruled that there was no coverage under these additional provisions when it concluded that no "direct physical loss or damage to property" occurred and granted complete judgment on the pleadings in reinsurers' favor. They therefore

¶ 13. Before any discovery, insured and reinsurers filed cross-motions for judgment on the pleadings pursuant to Vermont Rule of Civil Procedure 12(c). Reinsurers sought complete judgment on the pleadings, arguing that insured had not sufficiently alleged that "direct physical loss or damage to property" had occurred. Insured filed three motions for partial judgment on the pleadings. In the first motion, it argued that reinsurers' affirmative defense that the presence of SARS-CoV-2 in or on property cannot constitute "direct physical loss or damage to property" was incorrect as a matter of law. The other two motions requested judgment that two policy exclusions—seepage-pollution-contamination and microorganism—did not exclude coverage for loss or damage caused by the virus. In connection with its motion for partial judgment on the pleadings, insured filed motions for judicial notice of certain facts related to the virus and how it affects property. In response to reinsurers' motion, insured filed evidence in the form of declarations from certain employees of insured describing the impact of COVID-19 on the shipyards to support their opposition to reinsurers' motion.

¶ 14. Following a hearing, the trial court granted reinsurers' motion for judgment on the pleadings and consequently denied all of insured's motions.[6] The inquiry below focused on the

_____

assert that insured's failure to argue that there is coverage under these provisions on appeal, means that any claims under these provisions are abandoned and the trial court's implicit ruling on these issues is final regardless of the outcome of this appeal. Reinsurers cite only to the proposition that "[i]ssues not raised on appeal are deemed waived." Rowe v. Brown, 157 Vt. 373, 379, 599 A.2d 333, 337 (1991). The fate of insured's claims under these provisions is not presented in this appeal. To the extent these issues are raised on remand, it is the trial court's duty to resolve them consistent with this opinion, including determining whether or not these arguments have been waived. See Kinsman v. Paige, 24 Vt. 656, 657 (1853) (explaining that reversal of lower court opinion "opens such issues as were affected by the errors, for which judgment is reversed").

[6] At the hearing, insured's counsel stated, "if the court finds any aspect of our pleading lacking," the evidence submitted in response to reinsurers' motion and the facts requiring judicial notice reflected what would be added to an amended pleading. Insured proposes that this was a motion to amend and that the trial court denied it sub silentio. On appeal, insured proposes the trial court abused its discretion when it failed to give insured leave to amend its complaint. Reinsurers argue that the trial court correctly declined to give insured leave to amend its complaint because any such amendment would be futile. Assuming without deciding that insured's statements were a valid motion to amend and that the trial court denied that motion, we do not

7

meaning of "direct physical loss or damage to property" under the policy. The trial court acknowledged this Court's lack of precedent on the specific question presented and concluded that the presence of COVID-19 was capable of causing "direct physical loss or damage to property" under certain circumstances. It predicted that this Court would: (1) construe Vermont insurance law as incorporating the uninhabitability or physical contamination theory outlined in cases from other jurisdictions,[7] and (2) recognize covered loss or damage under the policy "resulting from the pervasive, long-term presence of a virus such as COVID-19, where the virus causes a premises to be uninhabitable, unusable, inaccessible, or unduly dangerous to use." It then concluded that insured did not experience loss of property but instead suffered an uncovered loss of income because the shipbuilding yards remained in operation despite the presence of the virus. The court denied all of insured's motions as moot. Insured appealed.

¶ 15.    On appeal, the overarching issue remains the same: how do we interpret "direct physical loss or damage to property" in this insurance policy? Insured proposes the trial court erred for several reasons. First, it argues the court incorrectly interpreted the policy when it concluded pandemic-related coverage is limited to property rendered "uninhabitable, unusable, inaccessible, or unduly dangerous to use." Second, it asserts that even if the trial court's interpretation is correct, the presence of the virus did render its shipbuilding yards "unduly dangerous to use." Third, it proposes that even if there was no "direct physical loss or damage to property" under the policy, insured was entitled to expenses it incurred while reducing its losses and protecting its property as required by the policy's language and the common-law mitigation

_____

need to address either insured's or reinsurers' arguments because they do not impact the outcome of this case. To the extent insured still wishes to amend its complaint, such request must be presented to and addressed by the trial court on remand.

[7]    For further discussion and explanation of this approach see <u>Brown's Gym, Inc. v. Cincinnati Insurance Co.</u>, No. 20 CV 3113, 2021 WL 3036545, at *1 (Pa. Ct. Com. Pl. July 13, 2021) and <u>Kim-Chee LLC v. Philadelphia Indemnity Insurance Co.</u>, 535 F. Supp. 3d 152, 161 (W.D.N.Y. 2021), <u>aff'd</u>, No. 21-1082-cv, 2022 WL 258569 (2d Cir. Jan. 28, 2022).

doctrine. Fourth, it contends that the trial court failed to consider the facts and evidence it submitted in support of its motions and in opposition to reinsurers' motion.

¶ 16. Reinsurers argue that the policy unambiguously requires some tangible harm to the property or that the property be physically lost due to an external physical force, such as by theft or being blown away, to constitute "direct physical loss or damage to property." They further assert that the spread of a virus as it occurred in insured's facilities cannot meet this standard as a matter of law. They propose that insured's mitigation argument is only relevant if coverage under the policy is triggered, which it was not in this case. They maintain that insured's evidence filed in opposition and in its requests for judicial notice would not change the outcome of this case and therefore the trial court correctly granted judgment on the pleadings without considering the information therein.

## I. Judgment on the Pleadings

¶ 17. We review de novo the trial court's decision granting judgment on the pleadings. Island Indus., LLC v. Town of Grand Isle, 2021 VT 49, ¶ 10, __ Vt. __, 260 A.3d 372. Judgment on the pleadings pursuant to Vermont Rule of Civil Procedure 12(c) is appropriate when "the movant is entitled to judgment as a matter of law on the basis of the pleadings." Messier v. Bushman, 2018 VT 93, ¶ 9, 208 Vt. 261, 197 A.3d 882 (quotation omitted). When reviewing a motion for judgment on the pleadings, we assume "all well pleaded factual allegations in the nonmovant's pleadings and all reasonable inferences that can be drawn therefrom" are true and "all contravening assertions in the movant's pleadings" are false. Thayer v. Herdt, 155 Vt. 448, 456, 586 A.2d 1122, 1126 (1990) (quotation omitted). The standard for granting a motion for judgment on the pleadings is an exacting one, and we will only uphold granting such motion "if the plaintiff's pleadings contain no allegations that if proven would permit recovery." Hinsdale v. Sherman, 171 Vt. 605, 606, 764 A.2d 1218, 1219 (2000) (mem.). This Rule 12(c) motion requires

9

us to interpret the insurance policy—a legal inquiry we undertake without deference. Whitney v. Vt. Mut. Ins. Co., 2015 VT 140, ¶ 11, 201 Vt. 29, 135 A.3d 272.

¶ 18. The parties agree that the outcome of this case depends on the interpretation of one specific phrase that explains when coverage under the insurance policy is triggered: "direct physical loss or damage to property." None of these terms are defined in the policy. The insurance policy states—and the parties do not contest—that Vermont law governs its interpretation. We begin by reading the plain language of the insurance policy to determine the parties' intent using settled principles of Vermont law and conclude that the policy is unambiguous. We then apply the plain meaning of the policy to the facts of the case as pleaded to determine whether insured sufficiently pleaded that "direct physical loss or damage to property" occurred to survive judgment on the pleadings in favor of reinsurers.

A. Interpretation of the Policy

¶ 19. "An insurance policy is construed according to its terms and the evident intent of the parties as expressed in the policy language." Cincinnati Specialty Underwriters Ins. Co. v. Energy Wise Homes, Inc., 2015 VT 52, ¶ 16, 199 Vt. 104, 120 A.3d 1160 (quotation omitted). Policy provisions must be "read together and viewed as an integrated whole." Progressive N. Ins. Co. v. Muller, 2020 VT 76, ¶ 11, 213 Vt. 145, 249 A.3d 24 (quotation omitted). We interpret terms in an insurance policy "according to their plain, ordinary, and popular meaning," and will enforce unambiguous terms as written. Brillman v. New Eng. Guar. Ins. Co., 2020 VT 16, ¶ 19, 211 Vt. 550, 228 A.3d 636 (quotation omitted). "Words or phrases in an insurance policy are ambiguous if they are fairly susceptible to more than one reasonable interpretation." Whitney, 2015 VT 140, ¶ 16. When the language is ambiguous, we construe the terms "liberally in favor of the insured and full coverage." Pharmacists Mut. Ins. Co. v. Myer, 2010 VT 10, ¶ 10, 187 Vt. 323, 993 A.2d 413. "However, the fact that a dispute has arisen as to proper interpretation does not automatically render the language ambiguous." Rainforest Chocolate, LLC v. Sentinel Ins. Co.,

10

2018 VT 140, ¶ 7, 209 Vt. 232, 204 A.3d 1109 (quotation omitted).  The insured has the burden of proving coverage under the policy, and once coverage is shown, the insurer has the burden of proving any exceptions to coverage apply.  N. Sec. Ins. Co. v. Stanhope, 2010 VT 92, ¶ 10, 188 Vt. 520, 14 A.3d 257.

¶ 20.  At the outset we acknowledge the jurisdictional split on how courts have approached the interpretation of similar or identical policy terms concerning "direct physical loss or damage to property" in pretrial motions, though we do not detail the various jurisdictional approaches in this opinion.  See Brown's Gym, Inc., 2021 WL 3036545, at *9-15 (extensively describing federal and state jurisprudence with focus on Pennsylvania); see generally J. DiMugno, The Implications of COVID-19 for the Insurance Industry and Its Customers: 2021 Developments, 33 Cal. Ins. L. & Regul. Rep., no. 2, March 2021 (detailing 2021 jurisprudence).  As reinsurers stress, there is a majority approach that has been adopted—primarily in various federal courts at the district and circuit levels but also in some state trial and appellate courts—under which courts have concluded that the presence of COVID-19 on a property is not "direct physical loss or damage to property" as a matter of law.  See, e.g., Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am., 15 F.4th 885, 892-93 (9th Cir. 2021) (holding no coverage for COVID-related losses under policy and noting its conclusion conformed with majority approach); Verveine Corp. v. Strathmore Ins. Co., 184 N.E.3d 1266, 1275-76 (Mass. 2022) (same); see also Covid Coverage Litigation Tracker, U. Penn., https://cclt.law.upenn.edu/ [https://perma.cc/T5RX-LQGN] (tracking cases and providing statistics).  Though we use the reasoning of cases across the spectrum of this jurisdictional divide to guide us, we emphasize that we are not bound by any of these decisions and that our conclusion is based on the application of settled principles of Vermont insurance law.[8]  See Town of Stowe

---

[8]  Although the courts in these cases may have adopted a different interpretation of "direct physical loss or damage to property" from our own and often from each other, we analyze and cite to these authorities to identify common threads of persuasive reasoning as opposed to the exact interpretation chosen.

v. Stowe Theatre Guild, 2006 VT 79, ¶ 9 n.2, 180 Vt. 165, 908 A.2d 447 ("While we may look to the reasoning of other states as persuasive authority, our ultimate objective is to reach decisions that comport with Vermont law and the reasonable expectations of the parties to the contract, and not to adopt a rule simply because there is apparent strength in numbers.").

¶ 21.  When we look to determine if an insurance policy's undefined terms have a plain meaning, we frequently refer to dictionary definitions.  See Simpson v. State Mut. Life Assurance Co. of Am., 135 Vt. 554, 556, 382 A.2d 198, 200 (1977) ("It is settled law that in the interpretation of insurance contracts, when a pivotal word is not defined either in the policy or the application it is permissible for the court to take judicial notice of its meaning as given in standard works, such as dictionaries." (quotation omitted)).  "Direct" is defined as "characterized by close logical, causal, or consequential relationship."  Direct, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/direct [https://perma.cc/S4MW-AYS7]; see also id. (providing another definition as "marked by absence of an intervening agency, instrumentality, or influence"); Direct, Black's Law Dictionary (11th ed. 2019) ("Free from extraneous influence; immediate.").  "Physical" commonly means "having material existence: perceptible especially through the senses and subject to the laws of nature."  Physical, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/physical [https://perma.cc/3DW7-ME45]; see also Physical, Black's Law Dictionary (11th ed. 2019) (defining term as "[o]f, relating to, or involving material things; pertaining to real, tangible objects" such as "the physical world around us").  "Loss" includes both "destruction, ruin" and "the partial or complete deterioration or absence of a physical capability or function."  Loss, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/loss [https://perma.cc/UCP4-NDL7].  "Damage" is "loss or harm resulting from injury to . . . property."  Damage, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/damage [https://perma.cc/3VDM-

12

MLP4]; see also <u>Damage</u>, Black's Law Dictionary (11th ed. 2019) (defining term as "loss or injury to . . . property").

¶ 22.    With these definitions in mind, a few principles guide our breakdown of the phrase "direct physical loss or damage to property." First, the phrase concludes with "to property" and this is a property insurance policy, thus our discussion is framed with a focus on what is happening to the insured property. See <u>Integrated Techs., Inc. v. Crum & Forster Specialty Ins. Co.</u>, 2019 VT 53, ¶ 24, 210 Vt. 506, 217 A.3d 528 ("In determining the reasonable expectations of the parties to an insurance contract, we must consider the policy in its entirety with an eye toward its general purpose." (quotation and brackets omitted)). The centrality of property to this insurance policy requires that something must occur affecting personal or real property for "direct physical loss or damage to property" to occur.

¶ 23.    This requirement stands even for "all-risk" policies like the one in this case. Although all-risk policies are generally construed in favor of coverage, risk and loss are distinct concepts. See <u>Columbiaknit, Inc. v. Affiliated FM Ins. Co.</u>, No. Civ. 98-434-HU, 1999 WL 619100, at *3 (D. Or. Aug. 4, 1999) (collecting cases and treatises in support). An all-risk policy covers losses resulting from certain perils—"active physical forces which cause the loss of or damage to the insured property." <u>Id</u>. Therefore, " 'all-risk' does not mean all-loss," because in order for a loss to fall under the policy, coverage must be triggered in the first instance by a covered risk. <u>City of Burlington v. Indem. Ins. Co. of N. Am.</u>, 332 F.3d 38, 47 (2d Cir. 2003) (applying Vermont law). Consequently, the requirement that any loss or damage be "direct," "physical," and "to property" to trigger coverage, necessarily precludes any purely economic harm from coverage under the policy. See <u>Down Under Masonry, Inc. v. Peerless Ins. Co.</u>, 2008 VT 46, ¶¶ 7-8, 183 Vt. 619, 950 A.2d 1213 (mem.) (concluding that installation of inferior shingles causing mere "aesthetic impact on property value" was not "property damage" under insurance policy defining "property damage" as "[p]hysical injury to tangible property" or "[l]oss of use of tangible

13

property that is not physically injured" (quotation marks omitted)); City of Burlington v. Ass'n of Gas & Elec. Ins. Servs., Ltd., 170 Vt. 358, 368, 751 A.2d 284, 291-92 (2000) (collecting cases to explain principle that insurance policies covering loss of use of tangible property do not insure against "purely economic losses" and concluding inverse—property loss via repossession and foreclosure caused by loss of income—is also not covered); Columbiaknit, Inc., 1999 WL 619100, at \*5 (collecting cases stating that loss in value not covered under similar all-risk property insurance policies); Crestview Country Club, Inc. v. St. Paul Guardian Ins. Co., 321 F. Supp. 2d 260, 264-65 (D. Mass. 2004) (same).

¶ 24.    Second, we must give meaning to each word in this essential phrase: "direct physical loss or damage to property." Under the rule of ejusdem generis, the more specific adjectives "direct" and "physical" modify both "loss" and "damage," the more generic nouns. See In re Tyler Self-Storage Unit Permits, 2011 VT 66, ¶ 8, 190 Vt. 132, 27 A.3d 1071 (stating ejusdem generis "dictates that, when words bearing a specific description are followed by words of more general import, the sense of the adjective first used is applied to the words that follow" (quotation omitted)); see id. (stating proper construction of "retail sales/rentals" was "retail sales or retail rentals" under principle of ejusdem generis); E.D. Keyes & Co. v. Union Pac. Tea Co., 81 Vt. 420, 425, 71 A. 201, 202 (1908) (applying ejusdem-generis rule to contract interpretation); E.M. Holmes & M.S. Rhodes, Holmes's Appleman on Insurance § 5.1, at 8 (2d ed. 1996) (explaining that insurance policies are interpreted using "same general rules applicable to the construction of written contracts"). Further, the rule against surplusage requires we give value to the decision to write the policy to cover "loss or damage." See N. Sec. Ins. Co. v. Mitec Elecs., Ltd., 2008 VT 96, ¶ 24, 184 Vt. 303, 965 A.2d 447 (stating we strive to give effect to all material parts of contract and avoid readings that would render portions of contract "mere surplusage"); Dep't of Corr. v. Matrix Health Sys., P.C., 2008 VT 32, ¶ 12, 183 Vt. 348, 950 A.2d 1201 (explaining that we "must consider the contract as a whole and give effect to every part contained therein to arrive at a

consistent, harmonious meaning, if possible" (quotation omitted)).  Accordingly, the policy covers "direct physical loss" and "direct physical damage," and each must have a distinct meaning.  If such were not the case, there would be no need for the policy to differentiate between physical loss and physical damage.[9]

¶ 25.  Using the definitions and principles outlined above, we first interpret "direct physical damage" and then "direct physical loss."

¶ 26.  We conclude that direct physical damage requires a distinct, demonstrable, physical change to property.  When we combine the definitions of "direct," "physical," and "damage" provided above, the plain meaning is evident.  The three components—immediate or proximate causation, see Direct, supra ¶ 21, material force or effect, see Physical, supra ¶ 21, and injury to property, see Damage, supra ¶ 21—when logically construed together require that there be a physical alteration to the property itself for damage to occur under the policy.  See also Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 235 (3d Cir. 2002) ("In ordinary parlance and widely accepted definition, physical damage to property means a distinct, demonstrable, and physical alteration of its structure." (quotation omitted)).  The addition of "distinct" and

---

[9] The dissent proposes that the phrase "the length of time for which loss may be claimed" in the period-of-recovery section of the policy demonstrates that "loss and damage are not always easily differentiated where they occur in [the] policy" and thus states our opinion, which focuses on the language for when coverage is triggered, fails to address the policy language as a whole. Post, ¶ 64 n.19.  Every mention of "loss" in the policy does not refer to "direct physical loss."  For example, "loss" is sometimes used to discuss financial losses that may be recouped if a covered event under the policy occurs.  In the section on business interruption, a type of coverage that must be claimed during the period of recovery, insured may file a claim for "[l]oss due to the necessary interruption of business . . . caused by physical loss or damage insured herein."  That section also discusses "loss" in terms of calculating profits lost and expenses incurred.  Reading the policy as a whole, the period-of-recovery quote to which the dissent refers means a claim for economic losses as a result of "direct physical loss or damage" impacting business operations.  Therefore, the interpretation expressed in this opinion does not render the "direct physical damage" analysis "inapplicable" to the period-of-recovery section in the manner the dissent contends.  In other words, distinguishing between "loss" and "damage" in the section on triggering coverage does not nullify the period-of-recovery section for business interruption coverage.  Furthermore, the existence of these other uses of "loss" makes interpreting the unique phrase "direct physical loss or damage" critical.

15

"demonstrable" to this definition is important because it "necessarily implicates the insured's burden of showing that a covered loss has occurred," i.e. an articulable change to the property. Columbiaknit, Inc., 1999 WL 619100, at *7; see Stanhope, 2010 VT 92, ¶ 10 (stating insured has burden of proving coverage). However, a distinct, demonstrable, physical alteration need not necessarily be visible; alterations at the microscopic level may meet this threshold. See Columbiaknit, Inc., 1999 WL 619100, at *7 (making observation while concluding adherence of molecules causing "persistent, pervasive odor" could constitute physical alteration); Ashland Hosp. Corp. v. Affiliated FM Ins. Co., No. 11-16-DLB-EBA, 2013 WL 4400516, at *4-5 (E.D. Ky. Aug. 14, 2013) (concluding disk drives altered on microscopic level due to heat exposure causing decrease in reliability constituted "direct physical loss or damage to insured property").[10]

¶ 27.    This definition is consistent with the policy section on the period of recovery, which defines the time for which a business-interruption claim may be made. See Muller, 2020 VT 76, ¶ 11 (explaining that insurance policies must be "viewed as an integrated whole" (quotation omitted)). Insured may make a business-interruption claim under the policy for the period starting with the date of the coverage-triggering event and not exceeding the time needed to "rebuild, repair or replace" the damaged property and such additional time as needed to restore insured's business to its pre-loss condition. If a distinct, demonstrable change to property occurred that caused an interruption in business operations, that change will likely need some type of physical remediation or repair to address that alteration. See Khamnei v. Burlington Pub. Works Comm'n, 2018 VT 19,

---

[10] We acknowledge that this definition is drawn from Couch's treatise, which states the majority rule requires a distinct, demonstrable, physical alteration for direct physical loss as well as direct physical damage, and that some courts have followed Couch in extending this requirement to loss. See 10A S. Plitt et al., Couch on Insurance § 148:46 (3d ed. 1995) (updated 2022); see, e.g., MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co., 115 Cal. Rptr. 3d 27, 37-38 (Cal. Ct. App. 2010). We use these terms to define direct physical damage because they comport with the plain meaning of the policy language and decline to extend this definition to direct physical loss because, as explained above, we determine that direct physical loss and direct physical damage must be two distinct concepts. See supra, ¶ 25.

¶ 14, 206 Vt. 550, 183 A.3d 1157 (" 'Repairs' is defined by the Cambridge dictionary as 'to put something that is damaged, broken, or not working correctly, back into good condition or make it work again.' "); Repair, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/repair [https://perma.cc/TX8D-J8PR] (defining repair as "to restore by replacing a part or putting together what is torn or broken;" "to restore to a sound or healthy state;" or "to make good: compensate for"); see also Verveine Corp., 184 N.E.3d at 1275 (interpreting similar period-of-recovery provision to imply that "there needs to be active repair or remediation measures to correct the claimed damage"). The existence of a need for remediation therefore enforces the allegation that damage has occurred.[11]

---

[11] The dissent views the "rebuild, repair, replace" language as creating a separate requirement in the definition of "direct physical loss or damage" that must be met for coverage to be triggered. Post, ¶ 56. We respectfully disagree. In this case, the period-of-recovery section informs interpreting "direct physical loss or damage" but does not impose additional requirements upon the policy language describing coverage-triggering events. This is particularly important because, as the dissent notes, the period-of-recovery section does not even directly apply to the section on when coverage is triggered. It is relevant only when "direct physical loss or damage" causes business interruption. We likewise find unpersuasive the dissent's proposition that under the plain terms of the policy, a "repair" must "restore property 'to the condition that would have existed had no loss occurred.' " Post, ¶ 69 (quoting period-of-recovery section of policy). The policy states that the period of recovery includes "[s]uch additional length of time to restore the insured's business to the condition that would have existed had no loss occurred." It is not necessarily true in all situations that a property must be in the in the exact state it was in pre-damage in order for a "repair" to take place that would restore the business to the condition it was in before. See Abajian v. TruexCullins, Inc., 2017 VT 74, ¶ 16, 205 Vt. 331, 176 A.3d 524 (including painting rust spots in list of "various repairs"); Bloomer v. Weber, 149 Vt. 187, 189, 542 A.2d 258, 260 (1988) (upholding trial court's conclusion that spraying black rubber undercoating to cover rust and protect engine could be proper under contract for car repairs).

Moreover, the definition provided above with no separate, specific "rebuild, repair, replace" requirement does not render the period-of-recovery section meaningless. See Southwick v. City of Rutland, 2011 VT 53, ¶ 4, 190 Vt. 106, 35 A.3d 113 ("[W]e will not embrace a construction of a contract that would render a provision meaningless." (quotation omitted)). A claim for business-interruption losses stemming from a "distinct, demonstrable, physical alteration" cannot include losses incurred after the physical alteration has been remediated, i.e. "rebuil[t], repair[ed], or replace[d]," as anticipated in the period-of-recovery section. The policy is harmonious for purposes of the issues presented in this appeal.

¶ 28.   Moving on, we conclude that direct physical loss to property requires persistent destruction or deprivation, in whole or in part, with a causal nexus to a physical event or condition. This definition can be broken down into four central components that weave together the policy terms as a whole while relying on compelling reasoning from decades of jurisprudence on occurrences that rise to the level of a direct physical loss under similar insurance policies.  In delving into the elements that contribute to our definition of direct physical loss, we find persuasive and are guided by the analysis set forth in Western Fire Insurance Co. v. First Presbyterian Church, 437 P.2d 52 (Colo. 1968) (en banc), the seminal case for addressing so-called "intangible" losses under property insurance policies triggered by "direct physical loss or damage."  As the Supreme Court of Colorado explained in that case, loss of use "cannot be viewed in splendid isolation, but must be viewed in proper context."  Id. at 55.

¶ 29.   First, direct physical loss requires deprivation or destruction of property.  This requirement is derived from the plain meaning of loss.  See Loss, supra ¶ 21 (defining loss as "destruction, ruin" or "the partial or complete deterioration or absence of a physical capability or function").  While destruction addresses situations in which property is no longer usable because it is harmed to the extent that it is physically gone from the world, deprivation opens the door for circumstances in which property is not harmed but may not be used for some reason.  It is necessarily true that property perfectly intact cannot be used if it is stolen.  As various courts have recognized over the years, deprivation may also occur when property is unusable due to a health hazard.  See W. Fire Ins. Co., 437 P.2d at 55 (gasoline fumes); Sentinel Mgmt. Co. v. N.H. Ins. Co., 563 N.W.2d 296, 302 (Minn. Ct. App. 1997) (asbestos); Motorists Mut. Ins. Co. v. Hardinger, 131 F. App'x 823, 826-27 (3d Cir. 2005) (E. coli); de Laurentis v. United Servs. Auto. Ass'n, 162 S.W.3d 714, 724-25 (Tex. App. 2005) (mold); TRAVCO Ins. Co. v. Ward, 715 F. Supp. 2d 699, 707-10 (E.D. Va. 2010), aff'd, 504 F. App'x 251 (4th Cir. 2013) (toxic gas); Mellin v. N. Sec. Ins. Co., 115 A.3d 799, 805 (N.H. 2015) (cat urine odor).  Beyond these broad categories, deprivation

18

can be identified in specific situations based on how the property was intended to be used and why it cannot be used in that manner anymore. See Stack Metallurgical Servs., Inc. v. Travelers Indem. Co. of Conn., No. 05-1315-JE, 2007 WL 464715, at *8 (D. Or. Feb. 7, 2007) (finding coverage where furnace was contaminated with lead and could still be used to treat metal generally but could no longer be used for medical devices as was intended); Shade Foods, Inc. v. Innovative Prod. Sales & Mktg., Inc., 93 Cal. Rptr. 2d 364, 376-77 (Cal. Ct. App. 2000) (explaining that presence of wood splinters mixed in with diced roasted almonds caused loss of use of cereal products containing said almonds).

¶ 30.    However, this is not to say that loss of use of a specific function is a limitless standard. In order for the deprivation-or-destruction requirement to be satisfied, an actual loss of use must have occurred and may not be prospective. See City of Burlington, 332 F.3d at 44 (declining to find physical loss or damage to property for defective welds that had not yet failed); Columbiaknit, Inc., 1999 WL 619100, at *7 (finding no loss of use when insured decided to sell garments as used instead of new because garments contained only presence of molecules that may eventually turn into mold or mildew but no mold or mildew had developed). Moreover, the insured must prove that it was actually deprived of use of its property. See Mama Jo's Inc. v. Sparta Ins. Co., 823 F. App'x 868, 879 (11th Cir. 2020), cert. denied, 141 S. Ct. 1737 (2021) (finding no direct physical loss where dust and debris in restaurant only required cleaning and restaurant continued to have ability to operate at full capacity but customer traffic decreased). Also, as explained above, a purely economic loss is insufficient to constitute a deprivation of property. See supra ¶ 23; see also, e.g., HRG Dev. Corp. v. Graphic Arts Mut. Ins. Co., 527 N.E.2d 1179, 1181 (Mass. App. Ct. 1988) (finding no physical loss from title defect). Furthermore, although loss of use is required, it alone is insufficient to establish a direct physical loss to property, for it is one part of a multifaceted definition.

¶ 31. Second, the deprivation or destruction may be in whole or in part. The policy language anticipates loss that only impacts part of the covered property. For example, in the business-interruption clause, the policy covers losses "whether total or partial . . . caused by physical loss or damage insured herein." Also, in the business-interruption clause, insured may recover to the extent it is "wholly or partially" unable to conduct its business. Similar language can be found in the leasehold-interest clause, which indemnifies insured for a proportion of rent when property is rendered "partially untenantable or unusable." Moreover, the period of recovery under the policy may cease when repair or replacement of "such part of the property as has been damaged is actually completed." References to "parts" of property are present throughout the description of various provisions on repairing and replacing property as well. Although none of these provisions are used to define "direct physical loss or damage," and the provisions are not applied until the policy is triggered, we may read the policy as a whole, and when we do so, it becomes clear that the language anticipates partial loss or damage. See Muller, 2020 VT 76, ¶ 11 (explaining that we read insurance policies as integrated whole).

¶ 32. However, allowing a direct physical loss to be "in part" does not detract from the fact that any deprivation must be discrete and identifiable. Take, for example, City of Burlington v. Indemnity Insurance Co. of America, in which a boiler had several defective welds, only some of which had failed and started to leak. 332 F.3d at 41. In that case, the fact that only parts of the insured property had been affected did not prevent the insured from recovering under the insurance policy for the impacted parts. Id. Each weld was discrete and identifiable. This type of analysis is equally applicable to loss of use, as one can identify a specific piece or portion of property that is lost, for example, one building within a complex of many. See Sentinel Mgmt. Co., 563 N.W.2d at 298 (noting evidence of asbestos contamination for each building controlled by same partnership); Aztar Corp. v. U.S. Fire Ins. Co., 224 P.3d 960, 966 (Ariz. Ct. App. 2010) (interpreting phrase "total or partial" in property insurance policy and identifying that partial

20

interruption may "mean the complete stoppage of a portion of an insured's business as contrasted with stoppage of the entirety of an insured's business" (emphasis omitted)). Whether a deprivation is in whole or in part is a matter of extent and serves as another important part of providing context for a loss. See W. Fire Ins. Co., 437 P.2d at 55 (explaining that loss of use "must be viewed in proper context"). Allowing analysis of whether the destruction or deprivation is in whole or in part therefore contributes to analysis of the other components of direct physical loss identified.

¶ 33. Third, deprivation of property must be causally linked to a physical event. The plain meaning of "direct physical loss" requires an "explicit nexus between the purported loss and the physical condition of the insured property." Boscov's Dep't Store, Inc. v. Am. Guar. & Liab. Ins. Co., 546 F. Supp. 3d 354, 365 (E.D. Pa. 2021), appeal docketed, No. 21-2422 (3d Cir. July 30, 2021); see Direct, supra, ¶ 21 (defining direct in terms akin to proximate cause). For example, in Western Fire, the loss of use was access to a church, and the physical event was an accumulation of gasoline around and under the church. 437 P.2d 52. As the court observed, the loss was "simply the consequential result" of that physical event. Id. at 55. This logic applies to other physical conditions that render property unusable for its intended purpose and therefore lost even though the property itself is not damaged. See, e.g., Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Int'l Ins. Co., 720 N.E.2d 622, 625 (Ill. App. Ct. 1999) (asbestos); Motorists Mut. Ins. Co., 131 F. App'x at 826-27 (E. coli); de Laurentis, 162 S.W.3d at 724-25 (mold); TRAVCO Ins. Co., 715 F. Supp. 2d at 707-10 (toxic gas from drywall); Gen. Mills, Inc. v. Gold Medal Ins. Co., 622 N.W.2d 147, 152 (Minn. Ct. App. 2001) (oats contaminated with unapproved pesticide not harmful for consumption but rendered illegal to sell).

¶ 34. Contrast that with situations in which there may be a loss of use of property but there is no direct physical loss because a government order as opposed to a physical condition related to the property caused the deprivation. See Source Food Tech., Inc. v. U.S. Fid. & Guar. Co., 465 F.3d 834, 838 (8th Cir. 2006) (finding government order blocking shipment of beef over

border due to mad-cow disease outbreak did not trigger coverage where no evidence that meat in question was contaminated); Phila. Parking Auth. v. Fed. Ins. Co., 385 F. Supp. 2d 280, 281 (S.D.N.Y. 2005) (finding no coverage for airport parking lot closure when government grounded planes temporarily following September 11, 2001); see also Wakonda Club v. Selective Ins. Co. of Am., 973 N.W.2d 545, 552-54 (Iowa 2022) (interpreting similar policy as requiring some kind of physical aspect to loss alleged and affirming dismissal where plaintiff affirmatively stated it had no knowledge of COVID-19 ever being present on premises). The causation requirement also manifests an observation we made above; no purely economic loss can constitute a direct physical loss, because any loss must link back to the condition of the property in question. See supra ¶ 23.

¶ 35. Fourth, destruction or deprivation of property must be persistent. This temporal element addresses how long the deprivation has persisted or will persist without any intervening action in order to remedy it. Deprivation or destruction must be persistent because the insurance policy anticipates that a direct physical loss may require the property to be rebuilt, repaired, or replaced. This language arises in the period-of-recovery section, which provides a time limit for recovery and therefore does not bear directly on whether coverage is triggered. However, it is useful when reading the policy as an integrated whole because it demonstrates that the policy anticipates a need for some kind of intervention to rectify the loss. Muller, 2020 VT 76, ¶ 11. When we read the "rebuild, repair, replace" language as part of a whole contract that covers the "absence of a physical capability or function," see Loss, supra ¶ 21, the logical conclusion is that the policy is triggered by losses that rise to this level of persistence.

¶ 36. This persistence requirement fits into the spectrum of precedent available on intangible losses. We find persuasive Judge Crawford's explanation in Kim-Chee LLC v. Philadelphia Indemnity Insurance Co. that courts have generally found coverage in situations where there is a persistent issue, such as a contamination, creating a loss but have declined to find coverage when the contamination is ephemeral or transient. See 535 F. Supp. 3d at 160-61

22

(collecting cases); see also Assocs. in Periodontics, PLC v. Cincinnati Ins. Co., 540 F. Supp. 3d 441, 446 (D. Vt. 2021) (same).

¶ 37.    The importance of persistence can be viewed in cases where an odor causes direct physical loss to property.  Although some odors and gasses cannot be seen or touched, they can be perceived by the senses and are caused by physical events.  See Mellin, 115 A.3d at 805.  In cases finding coverage, removal or remediation of the odor or gas was required in some way.  See id. at 801 (finding coverage for cat urine odor for which remediation efforts were unsuccessful); Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am., No. 2:12-CV-04418, 2014 WL 6675934, at *2 (D.N.J. Nov. 25, 2014) (involving insured who hired remediation company to dissipate ammonia from building); Essex Ins. Co. v. BloomSouth Flooring Corp., 562 F.3d 399, 406 (1st Cir. 2009) (offensive odor); W. Fire Ins. Co., 437 P.2d at 55 (gasoline odor); Farmers Ins. Co. of Or. v. Trutanich, 858 P.2d 1332, 1336 (Or. Ct. App. 1993) (methamphetamine odor); TRAVCO Ins. Co., 715 F. Supp. 2d at 707-10 (drywall releasing toxic gas).  These cases demonstrate that in order for something intangible to cause a direct physical loss, the cause of the loss must be so persistent as to require intervention, rather than the mere passage of time, to satisfactorily address it.  See Assocs. in Periodontics, PLC, 540 F. Supp. 3d at 446 ("[T]he phrase 'direct physical loss of or damage to' does not encompass transient phenomena of no lasting effect." (quotation omitted)).

¶ 38.    To summarize, the insurance policy in this case is unambiguous and must therefore be afforded its plain meaning.[12]  The phrase "direct physical loss or damage to property" includes

---

[12]  The interpretation of the property insurance policy in this case starts and ends with the plain and common meaning of the words written into the policy itself.  See Brillman, 2020 VT 16, ¶ 19 (stating that we enforce unambiguous terms as written).  We therefore reject insured's argument that the failure to include a virus-exclusion clause in this property insurance policy creates coverage.  See Kim-Chee, LLC, 535 F. Supp. 3d at 163 (explaining that failure to include virus exclusion in property insurance policy could not create coverage, noting that "[i]n the absence of ambiguity, the court has no cause to apply maxims of construction").

two distinct components, either of which will trigger coverage unless an exclusion applies: "direct physical damage" and "direct physical loss." "Direct physical damage" requires a distinct, demonstrable, physical change to property. "Direct physical loss" means persistent destruction or deprivation, in whole or in part, with a causal nexus to a physical event or condition. Purely economic harm will not meet either of these standards. In applying the plain meaning of the policy language as interpreted in this case, the insured has the burden of proving that the losses it alleges are either "direct physical loss" or "direct physical damage" to property.[13]

## B. Application of Interpretation

¶ 39. We now address whether insured's complaint adequately alleges "direct physical loss or damage to property" under the policy. As stated above, granting judgment on the pleadings is only appropriate when, taking all allegations in the complaint as true, it is "beyond doubt that there exist no facts or circumstances that would entitle [the plaintiff] to relief." Island Indus., LLC, 2021 VT 49, ¶ 20 (quotation omitted). This is a rigorous standard and accordingly, motions for judgment on the pleadings "are disfavored and should rarely be granted." Id. (quotation omitted).

¶ 40. Because the procedural posture is integral to the outcome in this case, it is important to explain why judgment on the pleadings is disfavored. Vermont has "extremely liberal" notice-pleading standards. Mahoney v. Tara, LLC, 2014 VT 90, ¶ 15, 197 Vt. 412, 107 A.3d 887. "[T]he threshold a plaintiff must cross in order to meet our notice-pleading standard is 'exceedingly low.' " Bock v. Gold, 2008 VT 81, ¶ 4, 184 Vt. 575, 959 A.2d 990 (mem.). A complaint need only be "a bare bones statement that merely provides the defendant with notice of the claims against it," for its "purpose is to initiate the cause of action, not prove the merits of the plaintiff's case." Colby v. Umbrella, Inc., 2008 VT 20, ¶ 13, 184 Vt. 1, 955 A.2d 1082. Accordingly, a Rule

---

[13] Insured also argued that if the trial court correctly interpreted the policy, it still adequately alleged direct physical loss or damage to property under that interpretation, and judgment on the pleadings in favor of reinsurers would need to be reversed on that ground. Based on our conclusion here, this argument is moot and need not be addressed.

12(c) motion "is designed to test the law of the claim, not the facts which support it." Island Indus., LLC, 2021 VT 49, ¶ 25 (quotation omitted).

¶ 41. First, we ask whether the complaint sufficiently pleads direct physical damage. As stated above, "direct physical damage" requires a distinct, demonstrable, physical alteration to property. In summary, the complaint alleges the following salient facts. The virus causing COVID-19 has been continuously present at insured's shipbuilding facilities. This fact is provable because insured had COVID-positive employees, those employees were infected at work, and infected persons spread the virus to surfaces. The virus can "adhere" to surfaces, transforming the surface into a fomite. This process of the virus "adhering" to surfaces caused "detrimental physical effects" that "altered and impaired the functioning of the tangible, material dimensions" of the property. Because of this alteration, the property cannot function for its intended purpose and insured's business has had to operate at a reduced capacity. To redress these physical alterations, insured took and will continue to take "steps that involve physical alterations to its insured locations," such as installing barriers and devices and redesigning physical spaces.

¶ 42. Taken together, these statements in the complaint adequately allege that the virus physically altered property in insured's shipyards when it adhered to surfaces. It is essential that the allegations involve more than just a government order interfering with insured's use of its property. See supra, ¶ 34 (explaining that government orders alone are insufficient to cause "direct physical loss or damage to property"). That the virus "adheres" to property, thus "altering and impairing" it in a tangible way, is a "bare bones statement" that provides reinsurers with notice of insured's allegations for how the virus can cause "direct physical loss or damage to property." Colby, 2008 VT 20, ¶ 13. This description of the process of how the virus causes damage to property also raises the complaint beyond the threshold of mere "conclusory allegation[s]." Id. ¶ 10. Moreover, if insured can prove such alteration occurred, it may constitute "direct physical damage" even if it is at a microscopic level. See supra, ¶ 26; Bressler v. Keller, 139 Vt. 401, 403,

25

429 A.2d 1306 (1981) (per curiam) (explaining we must take all reasonable inferences in favor of nonmoving party).

¶ 43. Moreover, insured alleged that, as a result of such physical alterations to its property, it has had to take steps to remedy the situation by physically altering its property in certain ways, including sanitization procedures, installation of physical barriers and devices, and redesign of physical spaces. This bolsters the argument that a distinct, demonstrable physical alteration occurred and is something that is in need of "repair" to restore business operations. See supra, ¶ 27 (explaining that repair connotes physical efforts to address damage and restore property to functioning as intended). Importantly, insured alleged it took steps beyond mere cleaning in order to remediate the alleged damage COVID-19 caused to its property. See Marina Pac. Hotel & Suites, LLC v. Fireman's Fund Ins. Co., 296 Cal. Rptr. 3d 777, 790 (Ct. App. 2022) (declining to grant demurrer in favor of defendant "based on a general belief that surface cleaning may be the only remediation necessary to restore contaminated property to its original, safe-for-use condition" and noting trial court did not take judicial notice of effectiveness of cleaning to protect against damage from COVID-19); cf. Cajun Conti LLC v. Certain Underwriters at Lloyd's London, No. 2021-CA-0343, 2022 WL 2154863, at *16 (La. Ct. App. June 15, 2022) (concluding that cleaning and decontamination could constitute "repair" when deciding that presence of COVID-19 was covered under similar policy).

¶ 44. The dissent disagrees with the inference that "adhere" could include a change in the physical dimensions of property and proposes that COVID-19 simply "rest[s] on" surfaces and can easily be remediated through simple cleaning techniques to "wipe[] away" the virus. Post, ¶¶ 53, 62. The dissent therefore concludes that it is impossible for COVID-19 to cause direct physical damage to property. Post, ¶ 70. We need not tick off each of the dissent's inferences, all of which are drawn against insured, that lead to its conclusion. Suffice to say, the dissent argues that its inferences are reasonable and that all other inferences to the contrary, specifically those that favor

26

insured in this case, are not.[14]  However, we are inclined to allow experts and evidence to come in to evaluate the validity of insured's novel legal argument before dismissing this case based on a layperson's understanding of the physical and scientific properties of a novel virus.  See Ass'n of Haystack Prop. Owners, Inc. v. Sprague, 145 Vt. 443, 447, 494 A.2d 122, 125 (1985) ("The legal theory of a case should be explored in the light of facts as developed by the evidence, and, generally, not dismissed before trial because of the mere novelty of the allegations."); Marina Pac. Hotel & Suites, LLC, 296 Cal. Rptr. 3d at 779 (observing that "when a pleading alleges facts sufficient to constitute a cause of action, what we think we know—beliefs not yet appropriately subject to judicial notice—has never been a proper basis for concluding, as a matter of law, those alleged facts cannot be true" and thus cannot justify resolving case against plaintiff at pleadings stage).

¶ 45.    Remanding this case and allowing further factual development in the trial court is consistent with the philosophy underlying notice pleading.  The purpose of notice pleading is "not to keep litigants out of court but rather to keep them in" so that the merits of the claim may "be sorted out during a flexible pretrial process and, as appropriate, through the crucible of trial."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 575 (2007) (Stevens, J., dissenting) (describing previous federal pleading standard).  It reflects a policy determination that, "unlike in the days of code pleading, separating the wheat from the chaff is a task assigned to the pretrial and trial process."  Id. at 583.  When a complaint contains a bare-bones claim for relief, "[t]he legal theory of a case should be explored in the light of facts as developed by the evidence."  Sprague, 145 Vt. at 447,

---

[14]    The dissent repeats variations of a maxim commonly used in recent COVID-19 insurance cases: COVID-19 harms people not property.  See, e.g., post, ¶ 63.  Though oft repeated, it is not "beyond doubt" that this maxim is true based on insured's pleadings.  Island Indus., LLC, 2021 VT 49, ¶ 20 (quotation omitted).  We accordingly decline to conclude that an event which allegedly causes a physical alteration to property, renders property such that it cannot be used as intended, and requires physical remediation efforts targeted at the physical alteration cannot be "direct physical damage" at this pre-discovery stage.

494 A.2d at 125. This concern is paramount for cases involving novel legal theories such as the one before us, where developing the factual basis to support a theory for coverage under a complicated insurance policy requires scientific evidence on a relatively recent and evolving phenomenon. See id. ("[T]he more extreme or even far-fetched is the asserted theory of liability, the more important it is that the conceptual legal theories be explored and assayed in the light of actual facts, not a pleader's supposition." (quotation omitted)). To end this litigation based on the limited information before us, simply because the alleged facts and the inferences therefrom may seem implausible at first based on what we think we know about COVID-19, would be premature. See Colby, 2008 VT 20, ¶ 13 (explaining that rules of civil procedure "strike fair balance" between allowing novel causes of action to develop and "discouraging baseless or legally insufficient ones"); see also Twombly, 550 U.S. at 586 (Stevens, J., dissenting) (stating that "fear of the burdens of litigation" does not justify relying on lawyers' assertions rather than investigating facts).

¶ 46. Although the science when fully presented may not support the conclusion that presence of a virus on a surface physically alters that surface in a distinct and demonstrable way, it is not the Court's role at this stage in the proceedings to test the facts or evidence. See Island Indus., LLC, 2021 VT 49, ¶ 20 (explaining that judgment on pleadings does not test facts alleged in support of claim). We cannot say "beyond doubt" that the virus does not physically damage surfaces in the way insured alleges. Id. (quotation omitted). Furthermore, insured's legal theory for coverage is novel, and allowing litigation to proceed in this case is required to "encourage[] valid, but as yet underdeveloped, causes of action." Colby, 2008 VT 20, ¶ 13; see Alger v. Dep't of Lab. & Indus., 2006 VT 115, ¶ 12 n.3, 181 Vt. 309, 917 A.2d 508 (explaining that standard is generous to nonmovant therefore we read complaint broadly, recognizing novel allegations). Because the complaint plausibly alleges "direct physical damage," reinsurers are not entitled to judgment on the pleadings.

28

¶ 47.    A theory of "direct physical damage" alone is sufficient to reverse, so we do not reach whether the complaint alleges facts that would entitle insured to relief under a theory of "direct physical loss."  "Direct physical loss" and "direct physical damage" are two distinct bases for coverage, thus insured's ability to plead sufficient facts to meet one saves its case from judgement on the pleadings in favor of reinsurers.  However, our conclusions in this opinion do not prevent insured from arguing that it experienced "direct physical loss" as defined herein on remand, and it may be the case that, once the evidence is presented, insured is successful in arguing that coverage under the policy was triggered using a theory of loss in addition to, or in lieu of, a theory of damage.  Assessment of the facts under a theory of loss is best left to the trial court as a more complete record is developed.

¶ 48.    To be clear, this opinion does not state that what occurred in insured's shipyards is "direct physical loss or damage to property" under the policy.  We merely conclude that insured has alleged enough to survive a Rule 12(c) motion under our extremely liberal pleading standards.  See Colby, 2008 VT 20, ¶ 5 n.1 (declining to adopt heightened federal pleading standard).  Following discovery, insured may not be able to show its losses stem from "direct physical loss or damage to property" under the tests articulated herein for those policy phrases.  Reinsurers may well be correct that insured's losses were not caused by any "direct physical loss or damage to property," but instead from the risks employees posed to each other or some other non-covered reason; however, we cannot agree that this is an "obvious fact" that undermines the various allegations in the complaint, which, at this stage, we must accept as true.  See Thayer, 155 Vt. at 456, 586 A.2d at 1126.

## II.  Impact on Other Issues

¶ 49.    Insured raises various arguments that fall away because we conclude that reinsurers were not entitled to complete judgment on the pleadings.  We do not reach insured's argument that even if "direct physical loss or damage to property" did not occur, it was still entitled to recover

29

under the so-called "mitigation" clauses in the insurance policy and the common-law mitigation doctrine. Similarly, we need not address whether the trial court erred when it did not consider information provided in insured's requests for judicial notice or its evidence submitted in opposition to reinsurers' motion. Nor do we need address insured's argument that the trial court should have converted reinsurers' motion into a motion for summary judgment in order to consider the aforementioned information plaintiff filed with the court outside the pleadings.

¶ 50. Insured also argues that the trial court erred when it denied as moot insured's motion for partial judgment on the pleadings as to reinsurers' affirmative defenses that the presence of the virus does not constitute "direct physical loss or damage to property." Based on our decision that insured has adequately pleaded facts triggering coverage under the policy, insured's partial motion for judgment on the pleadings is not moot. See Kinsman, 24 Vt. at 657 (explaining that reversal of lower court opinion "opens such issues as were affected by the errors, for which the judgment is reversed"). For this reason, the trial court erred in denying insured's motion for partial judgment on the pleadings as moot.[15] The merits of the arguments raised in insured's motion are not before us, and below, the trial court should consider insured's motion consistent with this opinion.

### III. Conclusion

¶ 51. The phrase "direct physical loss or damage to property" is unambiguous, and the common meaning of these terms therefore controls the interpretation of the property insurance policy in this case. Insured's complaint contains sufficient allegations to survive a Rule 12(c) motion for judgment on the pleadings under Vermont's extremely liberal pleading standards. We therefore reverse the trial court's grant of judgment on the pleadings in favor of reinsurers and the

---

[15] Insured does not raise arguments regarding the trial court's denial of its other two motions for partial judgment on the pleadings.

trial court's denial of insured's motion for partial judgment on the pleadings on the issue of reinsurers' affirmative defense.

Reversed and remanded for further proceedings consistent with this opinion.

FOR THE COURT:

_____

Associate Justice

¶ 52.   **CARROLL, J., dissenting.**    As a matter of law, human-generated droplets containing SARS-CoV-2 cannot cause "direct physical loss or damage to property" under this insurance policy.  No future litigation can change that reality.  While I agree with the majority's conclusion that the insurance contract term in dispute is unambiguous, I cannot agree that insured's claim survives beyond the pleadings stage.  Accordingly, I respectfully dissent.

¶ 53.   This case comes to us on a motion for judgment on the pleadings.  As the majority correctly notes, the threshold a plaintiff must cross to survive such a motion in Vermont is "exceedingly low."  Bock v. Gold, 2008 VT 81, ¶ 4, 184 Vt. 575, 959 A.2d 990 (mem.) (quotation omitted); see V.R.C.P. 12(c) ("After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings."); ante, ¶ 40.  However, this is not a toothless standard.  "A motion for judgment on the pleadings is designed to test the law of the claim, not the facts which support it."  Island Indus., LLC v. Town of Grand Isle, 2021 VT 49, ¶ 25, __ Vt. __, 260 A.3d 372 (quotation omitted).  Accordingly, although we take as "true all factual allegations . . . and all inferences that can be drawn from them," a plaintiff must actually plead an allegation "that if proven would permit recovery."  USGen New Eng., Inc. v. Town of Rockingham, 2003 VT 102, ¶ 14, 176 Vt. 104, 838 A.2d 927; see Hinsdale v. Sherman, 171 Vt. 605, 606, 764 A.2d 1218, 1219 (2000) (mem.).  "[T]he beauty of our rules of civil procedure is that they strike a fair balance, at the early stages of litigation, between encouraging valid, but as

yet underdeveloped, causes of action and discouraging baseless or legally insufficient ones." Colby v. Umbrella, Inc., 2008 VT 20, ¶ 13, 184 Vt. 1, 955 A.2d 1082. "While the legal theory of a case should be explored in the light of facts as developed by the evidence, where the plaintiff does not allege a legally cognizable claim, judgment on the pleadings is appropriate." Island Indus., LLC, 2021 VT 49, ¶ 25 (quotation omitted). Therefore, we need not accept as true conclusory statements with no factual basis or those "masquerading as factual conclusions." Colby, 2008 VT 20, ¶ 10 (quotation omitted); see also Bock, 2008 VT 81, ¶ 15 (Skoglund, J., dissenting) (explaining that this Court should refuse to accept "bald assertions, [and] unsupportable conclusions" (quotation omitted)).

¶ 54.    Despite a voluminous record, insured's claim reduces to this question: whether virus-infected droplets emitted from workers when they cough, sneeze, or speak cause "direct physical loss or damage to property" when those droplets come to rest on surfaces in the workplace. To answer this question, we must turn to the policy. This Court interprets insurance policies according to their plain, ordinary, and popular meaning, and we read individual policy provisions, not in isolation, but "together and viewed as an integrated whole." Progressive N. Ins. Co. v. Muller, 2020 VT 76, ¶ 11, 213 Vt. 145, 249 A.3d 24; ante, ¶ 19. With this in mind, I will briefly recount the relevant provisions to better explain why it is beyond doubt that insured cannot state a cognizable claim upon which relief can be granted. See Island Indus., LLC, 2021 VT 49, ¶ 20 (explaining dismissal on Rule 12(c) posture "appropriate only when . . . it is beyond doubt that there exist no facts or circumstances that would entitle [the plaintiff] to relief").

¶ 55.    This "all risk" property insurance policy "insures against all risks of direct physical loss or damage to property." Like many other all-risk policies, this phrase is left undefined. The policy contains a separate section describing specific losses and damages it excludes from coverage. Another section defines categories of losses the policy does cover. These categories include business-interruption losses and losses due to extra expenses incurred to keep operations

going following a qualifying event. Note that each of these covered-loss categories is expressly contingent on "physical loss or damage" to property.

¶ 56. Finally, the policy provides the terms under which insured can recover in the event of physical loss or damage to property. The period of recovery "[s]hall commence" at the time of the "loss or damage." The recovery period is not necessarily limited by the policy's expiration date but "shall not exceed" the time insured can "diligent[ly] . . . rebuild, repair, or replace the property that has been destroyed or damaged." Thus, for an event to physically damage insured's property under the terms of this policy, "it must be one that requires the property to be repaired, rebuilt, or replaced—that is, it must alter the property's tangible characteristics." Colectivo Coffee Roasters, Inc. v. Soc'y Ins., 2022 WI App 36, ¶ 11, 974 N.W.2d 442 (concluding that SARS-CoV-2 cannot constitute direct physical damage under similar all-risk policy and reversing trial court's denial of insurance company's motion for judgment on pleadings in notice-pleading jurisdiction).

¶ 57. None of these policy provisions operate on their own. For example, insured cannot claim that coverage begins before the event that causes physical loss or damage. Likewise, insured cannot claim business-interruption coverage for an event that did not cause physical loss or damage, or where the physical loss or damage occurred outside of the recovery period the policy describes. It follows, therefore, that the policy does not cover risks of direct physical loss or damage that do not require insured to rebuild, repair, or replace its property. "We assume that parties included contract provisions for a reason, and we will not embrace a construction of a contract that would render a provision meaningless." State v. Prison Health Servs., Inc., 2013 VT 119, ¶ 9, 195 Vt. 360, 88 A.3d 414 (quotation omitted). Many other courts have come to the same conclusion. See, e.g., SA Palm Beach, LLC v. Certain Underwriters at Lloyd's London, 32 F.4th 1347, 1361 (11th Cir. 2022) (" 'The need to repair, rebuild, replace, or expend time securing a new, permanent property is a pre-condition for coverage of lost business income and other expenses.' " (quoting Uncork & Create LLC v. Cincinnati Ins. Co., 27 F.4th 926, 932 (4th Cir.

2022)); Colectivo Coffee Roasters, Inc., 2022 WI App 36, ¶ 11; Sanzo Enters., LLC v. Erie Ins. Exch., 182 N.E.3d 393, 405-06 (Ohio Ct. App. 2021) (explaining that without "tangible and structural alteration," property cannot "be repaired, rebuilt, restored, or replaced"). The takeaway, at this stage in the litigation at least, is that insured must put reinsurers on notice that it has suffered (1) "direct physical loss or damage to property," and that it (2) repaired, rebuilt, or replaced the property as a result. I begin with the former.

¶ 58. The majority interprets the phrase "insures against all risks of direct physical loss or damage to property" to mean both "direct physical loss" and "direct physical damage." Relying on dictionary definitions, canons of construction, a leading treatise, and other courts, the majority ultimately concludes "direct physical damage" must be "a distinct, demonstrable, physical change to property." Ante, ¶ 26.[16] Thus, the first question to ask is whether insured has made sufficient allegations that virus-infected droplets that land on work surfaces constitute a "distinct, demonstrable, physical change to property."

¶ 59. The gist of insured's allegations on this point is that virus-infected droplets have continuously landed on surfaces in its facilities, and the presence of these droplets—known as "fomites" when they land on surfaces—renders the property incapable of functioning for its intended purpose.[17] Id. ¶ 41. Insured cites a dictionary definition to explain that a fomite is "an object (such as a dish, doorknob, or article of clothing) that may be contaminated with infectious

---

[16] Though the majority defines "direct physical loss" in some detail, it stops short of using loss as a basis for its holding. Ante, ¶ 46. Accordingly, I will not address it any further beyond stating that, in the way the majority defines the term, insured is even further from the mark with "direct physical loss" than it is with "direct physical damage."

[17] However, tellingly, insured has made no specific allegation that its properties ceased to function for their intended purposes or functioned for some other purpose than shipbuilding. Fundamentally, insured alleges that it suffered losses by being forced to stay open during the pandemic and taking certain measures such as screening employees for COVID-19. I agree with the majority that any losses accruing because of orders from civil authorities, or otherwise purely economic losses, are not recoverable under this policy. Ante, ¶¶ 23, 34.

agents (such as bacteria or viruses) and serve in their transmission." Fomite, Merriam-Webster, https://www.merriam-webster.com/dictionary/fomite [https://perma.cc/L6WT-Q45F]. Elsewhere, insured quotes the World Health Organization for the proposition that "[p]eople with the virus in their noses and throats may leave infected droplets on objects and surfaces [which are] called fomites." Insured alleges that the virus can "remain contagious on some surfaces for up to six days." At other points, insured alleges that these fomites, whether they have transformed the surface or have merely remained at rest on the surface, "remain a source of transmission for at least three days." At oral argument, counsel upped that number to twenty-eight days.

¶ 60. Despite the inconsistency, I will accept, as I must at this juncture, that insured's well-pleaded allegations are true, including any reasonable inferences I can draw from them. USGen New Eng., Inc., 2003 VT 102, ¶ 14. I will also accept as true that infected droplets, when they come into contact with a surface, become fomites, and that fomites may be contagious for up to twenty-eight days. Moreover, I will accept as true that the virus has been continually present at insured's properties since the pandemic emerged in early 2020.

¶ 61. From this basis, the majority concludes that insured's allegation that the "virus 'adheres' to property, thus 'altering and impairing' it in a tangible way, is a 'bare bones statement' that provides reinsurers with notice of insured's allegations for how the virus can cause 'direct physical . . . damage to property.'" Ante, ¶ 42. It certainly is a bare-bones statement. Indeed, the emperor has no clothes. Whether the fomite remains contagious for three or three-hundred days, it cannot cause damage to property if damage is defined as a "distinct, demonstrable, physical change." SARS-CoV-2 does not "alter the appearance, shape, color, structure, or other material dimension of the property." Sandy Point Dental, P.C. v. Cincinnati Ins. Co., 20 F.4th 327, 335 (7th Cir. 2021) (concluding even if virus is present and "attached" to surfaces, virus cannot "alter[] the physical structures to which it attached"); Verveine Corp. v. Strathmore Ins. Co., 184 N.E.3d 1266, 1276 (Mass. 2022) ("Evanescent presence of a harmful airborne substance that will quickly

35

dissipate on its own, or surface-level contamination that can be removed by simple cleaning, does not physically alter or affect property. While saturation, ingraining, or infiltration of a substance into the materials of a building or persistent pollution of a premises requiring active remediation efforts is sufficient to constitute 'direct physical loss of or damage to property,' evanescent presence is not." (citations omitted)).

¶ 62. No matter what verb insured uses, whether "adheres," "attaches," or even "on," a fomite does not physically change property. Insured has alerted this Court to a single appellate case standing for that proposition. See Marina Pac. Hotel & Suites, LLC v. Fireman's Fund Ins. Co., 296 Cal. Rptr. 3d 777 (Ct. App. 2022). In Marina, the California Court of Appeal held that the claimants sufficiently "alleged in their . . . complaint [that] . . . SARS-CoV-2 . . . not only lives on surfaces but also bonds to surfaces through physicochemical reactions." Id. at 787. The court explained that the claimants "specifically alleged they were required to dispose of property damaged by COVID-19 and limit operations." Id. (quotation marks omitted). However, insured has not made either allegation, and, as I will explain below, I can make no reasonable inference that "physicochemical reactions involving cells and surface proteins" occurred from insured's complaint. Aside from this exception, no other appellate court has held that the virus can constitute "direct physical damage." See, e.g., Brown Jug, Inc. v. Cincinnati Ins. Co., 27 F.4th 398, 402-03 (6th Cir. 2022) (joining the "Second, Fifth, Seventh, Eighth, Ninth, Tenth and Eleventh Circuits" in holding that as matter of law SARS-CoV-2 cannot cause "destruction or alteration of the property, or dispossession from the property"); Colectivo Coffee Roasters, Inc., 2022 WI App 36, ¶ 13 ("As the overwhelming majority of the other courts that have addressed the same issue have concluded, the presence of COVID-19 does not constitute a physical loss or damage to property because it does not alter the appearance, shape, color, structure, or other material dimension of the property." (quotation omitted)). I am aware that these cases are not binding on this Court. However, it is telling that so many cases have reached the same conclusion.

36

¶ 63. Insured makes no allegation that simply wiping surfaces with a paper towel and store-bought cleaning solution does not remove fomites. See SAS Int'l, Ltd. v. Gen. Star Indem. Co., 36 F.4th 23, 28 (1st Cir. 2022) ("[Claimant] makes no allegation that the virus cannot 'be removed by simple cleaning.' " (quoting Verveine Corp., 184 N.E.3d at 1276)). In fact, it concedes the point when it alleges that "cleaning could, at best, only temporarily remove the virus from surfaces" because of the persistent reintroduction of the virus from infected workers. Moreover, a reasonable person can understand that if he or she wipes away dust from a coffee table, the table is not somehow "repaired" in the process. Similarly, wiping away fomites does not "repair" insured's property. Crown Intermediate Holdco Inc. v. Allianz Glob. Risks U.S. Ins. Co., No. 2:22-CV-01248-SB-AFM, 2022 WL 2301880, at *4 (C.D. Cal. June 17, 2022) ("[Plaintiff] relies on its allegations that the virus was present in its theaters and attached to surfaces, creating fomites that rendered the theaters unsuitable for their ordinary use. But considering the plain meaning of the policy's language, the [c]ourt is unpersuaded that any layperson or reasonable policyholder would understand the presence of a virus on some of the surfaces in [plaintiff's] theaters as physical damage or alteration of the theaters.").

¶ 64. It also makes no difference, as the majority implies, that fomites may damage property microscopically, outside of direct, human sensory experience. Ante, ¶ 26. First of all, I agree that this policy can cover microscopic physical damage to property. However, insured's own allegations prove that this is a dead-end inference here. If the virus can be quickly cleaned up with materials commonly available in the workplace, and there is no allegation that surfaces where fomites once were remain dangerous, it follows that there is not microscopic damage. Indeed, the virus itself is microscopic, and the parties and the majority seem to have no trouble referring to it otherwise. It is turtles all the way down. The virus does not infect lightbulbs or desks or walls; these objects cannot develop COVID-19. The virus infects humans and causes COVID-19 in humans. This situation is categorically different from heat exposure causing disk-

drive alteration at the microscopic level, contrary to what the majority implies. See <u>Ashland Hosp.</u>

<u>Corp. v. Affiliated FM Ins. Co.</u>, No. 11-16-DLB-EBA, 2013 WL 4400516, at *4-5 (E.D. Ky. Aug.

14, 2013); <u>ante</u>, ¶¶ 26, 41.  In short, insured's argument that the virus damages its property is not

a novel claim, it is a metaphysical claim, and it cannot survive the pleadings.[18]  It is precisely the

kind of "legally insufficient" claim we have rejected many times before.  <u>Colby</u>, 2008 VT 20,

¶¶ 10, 13 (explaining Court need not accept as true conclusory statements in complaint without

factual basis).  This alone is enough to affirm the civil division's judgment.  However, there is an

independent, and equally fatal, flaw to insured's complaint.

¶ 65.  After defining "direct physical damage" as "a distinct, demonstrable, physical

change to property," <u>ante</u>, ¶ 26, the majority does not discuss how this definition must be read with

its necessary counterparts, one of which is the period-of-recovery provision.[19]  This oversight is

---

[18]  Though <u>Marina</u> is distinguishable on several other points, including that the court of appeal does not squarely address an analogous period-of-recovery provision as it might relate to the "all-risk" language as here, I emphasize that as a non-virologist, I can make no inference from what insured alleges that "physicochemical reactions involving cells and surface proteins" damage property.  296 Cal. Rptr. 3d at 787.  Insured has made no allegation even remotely like that.  In fact, the concept of microscopic damage does not appear at all in its complaint.  To the extent the majority can somehow infer such an allegation, <u>ante</u>, ¶ 42, I do not think the inference is reasonable, and insured's own allegations disprove it as demonstrated above.  See <u>Knight v. Rower</u>, 170 Vt. 96, 98, 742 A.2d 1237, 1239 (1999) ("[T]his Court takes as true all well-pleaded factual allegations in the nonmovant's pleadings and all <u>reasonable</u> inferences to be drawn from them." (emphasis added)).

[19]  The phrase used in the period-of-recovery provision, "[t]he length of time for which loss may be claimed," is one of several places in this policy that does not distinguish between "loss" and "damage."  Because the majority has chosen to focus only on "damage" as the basis for its holding, if it strictly construes this clause according to its plain meaning, the majority's analysis is rendered inapplicable because the calculation of time to recover is plainly based on "loss" not "damage."  However, what this section demonstrates is that loss and damage are not always easily differentiated where they occur in this policy, and that by focusing only on the loss-or-damage-insured section to the exclusion of the rest, the majority has not fairly addressed all of the applicable policy language.

The majority's contention that I consider the term "direct physical damage" "inapplicable" to the period-of-recovery provision is flatly incorrect.  <u>Ante</u>, ¶ 24 n.9.  As described below, the policy states that the period-of-recovery provision directly applies to business-interruption and extra-expense coverages.  I infer that this means it does not directly apply to the section titled

crucial. Insured has pled no allegations describing measures it took to rebuild, repair, or replace any covered property. Hinsdale, 171 Vt. at 606, 764 A.2d at 1219 (pleadings must contain some allegation "that if proven would permit recovery"). However, insured, for the first time in its reply brief, argues that the period-of-recovery provision "does not determine whether there is an insured loss, but rather the duration of that loss." Indeed, insured continues, the period-of-recovery provision does not apply to the term "direct physical loss or damage" at all. Alternatively, it argues that even if that provision does determine what constitutes physical loss or damage, insured sufficiently alleged the need to repair its property because it "took various steps to attempt to restore its property to a sound or healthy state," citing the Merriam-Webster Dictionary definition. I will address each argument in turn.

¶ 66. Insured's argument that the period-of-recovery provision in the policy does not apply to the all-risk phrase found in the loss-or-damage-insured section misses the point. The loss-or-damage-insured section cannot be read in isolation; it sets out the general rule of coverage under this policy. It provides that the policy covers "all risks of direct physical loss or damage to property

---

"Loss or Damage Insured," where "direct physical damage" is first found. However, the period-of-recovery provision is intimately connected with the term "direct physical damage." This term is not actionable on its own. It makes sense that the policy would not have the period-of-recovery provision apply directly to what amounts to a declarative section. Instead, the period-of-recovery provision applies to certain types of coverages, which themselves rely on "direct physical damage" to be triggered.

In contrast, it is insured that argues that these parts of the policy are entirely separate. Insured takes this position because it can only prevail if this Court permits the case to proceed without reading the policy as "an integrated whole." Muller, 2020 VT 76, ¶ 11. Even if a fomite is a triggering event, which it is not, insured still cannot prevail because there must be some loss incurred. Without capital spent on repairing, rebuilding, or replacing damaged property, what need is there for reimbursement under the policy? The period-of-recovery provision is therefore not a "separate requirement in the definition of 'direct physical loss or damage,' " as the majority suggests I created; the provision is an independent, necessary predicate for coverage that insured cannot demonstrate applies. Ante, ¶ 27 n.11; see also Island Indus., LLC, 2021 VT 49, ¶ 20 (stating that Rule 12(c) is appropriate where it is ultimately "beyond doubt that there exist no facts or circumstances that would entitle [the plaintiff] to relief." (quotation omitted)).

described herein occurring <u>during the term of insurance</u> . . . except as hereinafter excluded." (Emphasis added). The policy elaborates on the general rule in the sections that explain what is excluded from coverage and what is not. The section explaining coverages begins with a description of the real and personal property the policy covers. This section also describes the categories of covered losses that flow from physical loss or damage, two of which insured claims it has suffered: business-interruption losses and extra expense.

¶ 67. Now, the period-of-recovery section states that it only applies to business-interruption losses and extra expense, and two other types of loss not relevant to this appeal. Accordingly, the period-of-recovery section apparently does not apply to real and personal property or to the loss-or-damage-insured section. Insured argues that this is evidence the term "rebuild, repair, or replace" is inapplicable to property damage. However, upon closer inspection of business-interruption losses and extra expense, both are contingent on "[l]oss . . . caused by physical loss or damage insured herein during the term of this Policy to real and/or personal property described in [real and personal property section]." It follows, then, that the period of recovery necessarily means that insured must allege that it rebuilt, repaired, or replaced property to prevail at this stage. <u>Muller</u>, 2020 VT 76, ¶ 11 ("Property insurance contract interpretation requires that the policy provisions be read together and viewed as an integrated whole." (quotation omitted)).

¶ 68. Before moving on, it is important to define the three crucial terms found in the period-of-recovery provision: rebuild, repair, and replace. Rebuild means "to make extensive repairs to, [or] to restore to a previous state." <u>Rebuild</u>, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/rebuild [https://perma.cc/45ZZ-D78H]. Repair means to "to restore by replacing a part or putting together what is torn or broken, [or] to restore to a sound or healthy state." <u>Repair</u>, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/repair [https://perma.cc/TX8D-J8PR]. And replace means to "to restore

40

to a former place or position, [or] to take the place of especially as a substitute or successor." Replace, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/ replace [https://perma.cc/R4AT-33CS]. To the extent insured's argument is preserved, insured only argues that it alleged sufficient allegations with respect to "repair."

¶ 69. In its complaint, insured alleges that it incurred expenses "to protect its properties from damage caused by the presence of SARS-CoV-2." But what this means, by its own admission, is that insured took measures to reduce the spread of the virus through "extensive sanitation and cleaning," temperature checks, employee education, "wellness screening," testing protocols, contact tracing, social-distancing requirements, and other policies concerning which employees may work at the facilities. Conspicuously absent from insured's own account of the measures it took, is anything fairly characterized as a repair as defined above. See Marina Pac. Hotel & Suites, LLC, 296 Cal. Rptr. 3d at 787 ("The insureds specifically alleged they were required to dispose of property damaged by COVID-19 and limit operations . . . ." (quotation marks omitted)). But this absence is easily explained. Insured did not take any of these measures because its property was damaged. Insured did not need to repair property "by replacing a part or putting together what [wa]s torn or broken" or restore the property "to a sound or healthy state." It took these measures to protect people. This is best explained in insured's own words:

> [Insured] has suffered substantial delays in its operations due to, among other things, the need to modify and stagger work to reduce crowding and achieve social distancing, extensive sanitation and cleaning at its facilities to comply with CDC guidance and government orders, the daily unavailability of dozens of employees because of illness or CDC-required quarantine due to exposure to SARS-CoV-2, and numerous other precautions taken at the direction of government authorities and the CDC that affect the employees' ability to work.

(Emphases added).

¶ 70. This is not the complaint of a litigant seeking recovery in response to measures it took to repair its property. This is the complaint of a litigant seeking recovery for being forced to

remain open during a pandemic at less-than-full capacity because of human-resources issues. And remember, under the plain terms of this policy, repairing must restore the property "to the condition that would have existed had no <u>loss</u> occurred." (Emphasis added). Note that insured also alleges that the virus is continually present at its properties. So, even taking insured's argument about whether it took measures to repair its property at face value, repair is logically impossible because the virus is constantly present no matter what insured does due to the virus being constantly reintroduced by employees.[20]

¶ 71. Indeed, I submit that fomites cannot trigger this policy at all. Fomites are ephemeral and invisible. Which fomite caused the putative damage here? On which date? Insured makes no allegation that a particular fomite discovered on a particular date caused "direct physical damage" to property. Indeed, it cannot. The inference that SARS-CoV-2 has been continuously present at insured's properties does not answer these questions either. SARS-CoV-2 is not itself a triggering event under this policy; the policy requires a "direct" causal relationship. See <u>ante</u>, ¶ 21 (defining "direct"). Insured has alleged that fomites, not the virus, damage property. But even if fomites were continuously present on insured's property, an inference I will accept in favor of insured,[21] insured still cannot prevail because it cannot isolate the fomite—or even a group of fomites—that triggered "direct physical damage." Moreover, assuming fomites damage property, which they do not, the damage would be ephemeral and undetectable, and the measures insured

---

[20] The majority impliedly concedes this when it correctly notes that "[a] claim for business interruption losses stemming from a 'distinct, demonstrable, physical alteration' cannot include losses incurred after the physical alteration has been remediated." <u>Ante</u>, ¶ 27 n.11

[21] The majority contends that I have made several inferences against insured. See <u>Knight</u>, 170 Vt. at 98, 742 A.2d at 1239 ("[T]his Court takes as true all well-pleaded factual allegations in the nonmovant's pleadings and all <u>reasonable</u> inferences to be drawn from them." (emphasis added)). I respectfully disagree. I have explained which inferences I take to be reasonable. See, e.g., <u>supra</u>, ¶ 59. However, it is not reasonable to infer, based purely on insured's complaint, that fomites physically damage property just because it says they do. It is also not reasonable to infer that the pandemic or the virus itself is a triggering event under this policy.

42

has alleged it has taken or will take do not address any specific fomite, but the mere possibility that they may be present. I hasten to add that even here, any measure insured allegedly took was directed at workers, not at property. Insured cannot have it both ways. It cannot claim that it is taking measures to restore workplaces "to a sound or healthy state" and simultaneously claim that by definition those measures will never work.

¶ 72. The majority, however, maintains that insured "had to take steps to remedy the situation by physically altering its property in certain ways." Ante, ¶ 43. The majority confuses the installation (or planned installation) of physical barriers, devices, and redesign of physical spaces for a repair, a rebuild, or a replacement in response to damage to property. Indeed, insurer itself only alleges that it took or might have to take measures best characterized as repairs. But these measures, to the extent they are repairs at all, do not and cannot repair damage to property. What damaged property is repaired by installing a barrier to keep employees separated? The answer is obvious—none. No expert testimony and no amount of discovery will change this commonsense fact.

¶ 73. To sum up, insured's allegation that fomites cause physical damage to its property cannot be proven because fomites demonstrably have no effect on the tangible, physical dimension of insured's property. No reasonable person in insured's position would think otherwise. Second, even if that claim could somehow be proven—which would be a first in the United States—insured has not made a single allegation implicating a necessary corollary provision of this policy.

¶ 74. Other notice-pleading jurisdictions have come to the same result at the pleadings stage. Most recently, in Colectivo Coffee Roasters, Inc., the Wisconsin Supreme Court held that the presence of the virus does not constitute physical damage because it "does not necessitate structural repairs or remediation; it can be removed from a surface with a disinfectant." 2022 WI App 36, ¶ 13 (quotation marks omitted). Surveying other relevant case law, the Wisconsin Supreme Court sensibly explained that SARS-CoV-2 fomites cannot damage property because

43

they do "not alter the appearance, shape, color, structure, or other material dimension of the property. Id. (quotation omitted). This is no different than the definition the majority arrived at for "direct physical damage" here, "a distinct, demonstrable change to property." Ante, ¶ 27. The danger, the court explained, is to "people in close proximity to one another, not to the real property itself." Colectivo Coffee Roasters, Inc., 2022 WI App 36, ¶ 13 (quotation omitted).

¶ 75. In Verveine Corp., the Massachusetts Supreme Judicial Court similarly held that

> Evanescent presence of a harmful airborne substance that will quickly dissipate on its own, or surface-level contamination that can be removed by simple cleaning, does not physically alter or affect property. While saturation, ingraining, or infiltration of a substance into the materials of a building or persistent pollution of a premises requiring active remediation efforts is sufficient to constitute 'direct physical loss or damage to property,' evanescent presence is not.

184 N.E.3d at 1276 (citations omitted). See also Consol. Rest. Operations, Inc. v. Westport Ins. Corp., 205 A.D.3d 76, 83-87 (N.Y. App. Div. 2022) ("[Claimant's] insurance policy does not provide coverage for financial loss, without direct physical damage or loss, and its inability to operate the property as intended is not discernable, direct physical damage or loss to its property, but rather an external force limited [its] use of the property."); Sanzo Enters., LLC, 182 N.E.3d at 405 (affirming Rule 12(c) dismissal and explaining that without "tangible and structural alteration" property cannot "be repaired, rebuilt, restored, or replaced").

¶ 76. I agree that we disfavor Rule 12(c) dismissals, and that Vermont's notice-pleading standards are an important aspect of our legal system. However, when it is beyond doubt that a litigant has not pleaded an allegation that if proven would permit recovery, Rule 12(c) offers the "advantage of disposing of the case at an early stage of the litigation, which may help crowded trial dockets and conserve the time and energy of both the court and the parties." 5C C. Wright & A. Miller, Federal Practice and Procedure § 1367 (3d ed. 2021).

¶ 77. The majority reasons that it is better to let expert evidence come in to evaluate insured's legal argument. This is flawed for several reasons. Many litigants who do not survive

44

the pleadings stage submit that if only they could develop a factual record, they would ultimately prevail. If courts agreed with this notion, Rule 12(b) and Rule 12(c) would be rendered useless. Furthermore, if resolving insurance-policy disputes such as this one always required expert evidence, even where no fact if proven would provide the nonmovant with its requested relief, policy contracts would become ever more complex and unwieldy. This would no doubt result in increased costs for the industry and policyholders alike.

¶ 78. Insured has not pleaded any allegation that if proven would permit recovery. The simple truth is that this virus cannot cause "direct physical damage" to property under the unambiguous terms of this insurance policy, particularly when policy terms are not "viewed in splendid isolation," as the majority has done, but as an integrated whole. Ante, ¶ 27 (quoting W. Fire Ins. Co. v. First Presbyterian Church, 437 P.2d 52, 55 (Colo. 1968) (en banc)).

¶ 79. It is one thing to conclude that a disputed insurance policy term is ambiguous and permit litigation to proceed in a Rule 12(c) posture. It is quite another to conclude that one phrase—"direct physical damage"—is unambiguous and (1) accept as true the implausible claim that human-generated, infectious droplets can damage property, and (2) to do so without construing, as we must, all relevant policy provisions together. Accordingly, to save valuable time and energy for both the court and the parties from litigation with a preordained outcome, I would affirm the trial court's order granting reinsurers' motion for judgment on the pleadings and affirm the trial court's order of dismissal.

¶ 80. I am authorized to state that Judge Bent joins this dissent.

_____
Associate Justice

45