IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| WASHINGTON STATE UNIVERSITY, a public university, | ) ) ) | No. 40093-0-III |
| Appellant, | ) ) | |
| v. | ) ) | |
| FACTORY MUTUAL INSURANCE COMPANY, a Rhode Island corporation, | ) ) ) | UNPUBLISHED OPINION |
| Respondent. | ) | |

FEARING, J. —

A **fomite** (/ˈfoʊmaɪt/) or **fomes** (/ˈfoʊmiːz/) is any inanimate object that, when contaminated with or exposed to infectious agents (such as pathogenic bacteria, viruses or fungi), can transfer disease to a new host. *Fomites*, WIKIPEDIA, *https://en.wikipedia.org/wiki/Fomite#cite_note-Cramer2019-1* (last visited Aug. 20, 2025).

In addition to objects in hospital settings, other common fomites for humans are cups, spoons, pencils, bath faucet handles, toilet flush levers, door knobs, light switches, handrails, elevator buttons, television remote controls, pens, touch screens, common-use phones, keyboards and computer mice, coffeepot handles, countertops, drinking fountains, and any other items that may be frequently touched by different people and infrequently cleaned. *Science Brief*: *SARS-CoV-2 and Surface* (*Fomite*) *Transmission for Indoor Community Environments*, U.S. CENTERS FOR DISEASE CONTROL AND PREVENTON (April 5, 2021), *https://archive.cdc.gov/#/details?url=https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html*.

No. 40093-0-III
*Wash. State Univ. v. Factory Mutual Ins. Co.*

Appellate courts throughout the nation now continually face, in varying settings, disputes stemming from the consequences of COVID-19. In this appeal, we join numerous courts, including Washington courts, in determining whether an insured may recover for business losses resulting from closures ordered by government fiat during the early days of the pandemic. We deem ourselves bound by the Washington Supreme Court's decision in *Hill and Stout PLLC v. Mutual of Enumclaw Insurance Company*, 200 Wn.2d 208, 515 P.3d 525 (2022). We also follow the lead of our sister division in *Tulalip Tribes of Washington v. Lexington Insurance Company*, 34 Wn. App. 2d 108, 112, 566 P.3d 149 (2025), when ruling that a business' shutdown due to the COVID-19 epidemic does not constitute "direct physical loss or damage" to property within the meaning of an all-risk insurance policy. We affirm the superior court's grant of Factory Mutual Insurance Company's judgment on the pleadings in a suit brought by Washington State University (WSU) under an insurance policy.

FACTS

The sole question presented by this appeal is whether a Factory Mutual Insurance policy purchased by WSU covered losses sustained by the university during the early months of the COVID-19 pandemic. We first outline the relevant provisions of the insurance policy. Next, we narrate the impacts of the pandemic on WSU. Because the

2

superior court dismissed WSU's suit on the pleadings, we procure the facts from the university's second amended complaint.

Plaintiff and appellant WSU is a public land-grant research university with its main campus in Pullman and additional satellite campuses and facilities throughout the state of Washington. WSU is an agency of the state of Washington. It has over 8,000 employees and, in 2019, enrolled more than 31,600 students. Over 20,000 of those students attended the Pullman campus.

In September 2018, WSU purchased from defendant Factory Mutual Insurance Company, a master global all-risk insurance policy to protect the university's business property and income. The policy lasted from October 1, 2018, through October 1, 2020. The policy covered WSU's real and personal property "against ALL RISKS OF PHYSICAL LOSS OR DAMAGE" unless excluded under the terms of the policy. Clerk's Papers (CP) at 256. The nomenclature "physical loss or damage" plays prominence in this appeal. The policy did not define the terms "loss," "damage," "physical," or "physical loss or damage." CP at 4.

The Factory Mutual policy included a time element endorsement. This endorsement insured WSU for time element loss "directly resulting from *physical loss or damage* of the type insured." CP at 294 (emphasis added).

A contamination exclusion clause in the Factory Mutual policy declared:

3

> D. This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:
> 1) *contamination*, and any cost due to contamination including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy. If contamination due only to the actual not suspected presence of contaminant(s) directly results from other physical damage not excluded by this Policy, then only physical damage caused by such contamination may be insured. This exclusion D1 does not apply to radioactive contamination which is excluded elsewhere in this Policy.

CP at 270 (emphasis added) (boldface omitted). The insurance policy defined "contamination" as:

> any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, *virus*, disease causing or illness causing agent, fungus, mold or mildew.

CP at 327 (emphasis added). Despite this exclusion, WSU's issued policy provided $1 million in limits for losses sustained by reason of interruption of operations from a communicable disease coverage.

Washington State Governor Jay Inslee issued Proclamation 20-05 on February 29, 2020, declaring a state of emergency in this state due to the rapid transmission of COVID-19 between Washington residents. On March 11, Inslee issued Proclamation 20-07. In addition to taking other measures, Proclamation 20-07 prohibited gatherings of 250 people or more for most activities, including recreational activities. Governor Inslee issued another proclamation on March 16, Proclamation 20-13, which prohibited

4

restaurants from offering in-person dining. The "Stay Home—Stay Healthy Order," Proclamation 20-25, came on March 21. Proclamation 20-25 barred Washingtonians from leaving their homes for nonessential reasons and directed nonessential businesses to "cease performing all but minimum basic operations' necessary to 'maintain the value of the business' inventory, preserve the condition of the business' physical plant and equipment, [and] ensure security." (internal quotation marks omitted) (emphasis omitted) (alteration in original). Proclamation 20-25.1, issued on April 2, extended Proclamation 20-25's restrictions to at least May 4, 2020. On May 4, Inslee again extended Proclamation 20-25 and extended Proclamation 20-25.1 through May 31, 2020.

On March 11, 2020, WSU suspended all in-person instruction and implemented "remote learning" through the remainder of the spring semester. CP at 23. On March 17, 2020, the university's dining services ended in-person dining and limited the availability of food options at its facilities to delivery and "to-go" only. CP at 23. Also on March 17, WSU cancelled summer education abroad programs and refunded the fees for the programs. On March 22, the school shut all libraries on the Pullman campus. WSU ended all sporting events. As a result of university action, many students chose to live at home for remote instruction rather than reside in school housing. The suspension of operations caused business income loss through the loss of tuition fees, room and board payments, ticket sales to sporting, cultural, and educational events, and food and

beverage sales. WSU fashioned physical changes to its locations and purchased structures to mitigate exposure of the virus to staff and students. The university conducted frequent testing of staff and students, enhanced sanitization of surfaces, added technology to enable distance learning, installed physical barriers, and changed air flow and ventilation in covered buildings. WSU asserts that, as a result of the suspensions and limitations of its operations, it has suffered business interruption losses totaling $63,068,573.

WSU filed a claim with Factory Mutual seeking coverage for business income loss and other losses it suffered due to the COVID-19 pandemic and COVID-19 virus. Factory paid $1 million to WSU under the separate interruption by communicable disease endorsement. Factory Mutual denied other coverage under its insurance policy because it determined that the COVID-19 virus had not caused "physical loss or damage" within the meaning of the policy, and, even if it did cause such loss or damage, the contamination exclusion barred coverage. CP at 28.

## PROCEDURE

WSU filed suit on July 2, 2021. On March 2, 2022, the parties stipulated to stay the proceedings to wait for the Washington State Supreme Court's decision in *Hill & Stout PLLC v. Mutual of Enumclaw Insurance Company*, 200 Wn.2d 208 (2022).

On December 22, 2022, after the Supreme Court issued its decision in *Hill & Stout*

6

*PLLC,* 200 Wn.2d 208 (2022), WSU filed a second amended complaint. Because the

allegations in the second amended complaint function as the operative facts for this

appeal, we extensively quote from the pleading.

> 44. The omnipresence of the COVID-19 virus is enabled by multiple modes of viral transmission, including respiratory droplets, airborne and fomite transmission (i.e., transmission from surfaces and objects). These transmission methods demonstrate that the COVID-19 virus causes direct physical loss or damage to property.
>     . . . .
> 52. The COVID-19 virus may also be transmitted to people from physical objects, materials or surfaces. "Fomites" are physical objects or materials that carry, and are capable of transmitting infectious agents, altering these objects to become vectors of disease. Fomite transmission has been demonstrated as highly efficient for viruses, both from object-to-hand and from hand-to-mouth.
>     . . . .
> 55. Importantly, the COVID-19 virus has been detected on environmental objects and surfaces from symptomatic, pre-symptomatic, and asymptomatic individuals. Fomites transform the surface of property into a potentially deadly transmission device . . .
> 56. Accordingly, the presence of the COVID-19 virus in and on property, including in indoor air, on surfaces and on objects, causes direct physical loss or damage to property by causing physical harm to and altering the property and otherwise making physical property unfit and incapable of being used for its intended purpose.
> 57. Among other things, the presence of the COVID-19 virus transforms everyday surfaces, materials, and objects into fomites, causing tangible change to the physical condition of the property into a transmission vehicle for disease from one host to another. The WHO's [World Health Organization's] description of fomite transmission of the virus expressly recognizes this physical alteration of property, describing the viral droplets as "*creating* fomites (contaminated surfaces)." (emphasis added). "Creating" involves making or bringing into existence something new— such as something that is in an altered state from what it was before the

7

COVID-19 virus was present on, in, and around the property.

58. The COVID-19 virus adheres to surfaces and objects, harming and physically changing and physically altering those objects by becoming a part of their surface and making physical contact with them unsafe or unfit for their ordinary and customary use. Once the COVID-19 virus is in, on, or near property, it is easily spread by the air, people, and objects, from one area to another, causing additional direct physical loss or damage.

59. Additionally, the presence of the dangerous and potentially fatal COVID-19 virus in and on property, including in indoor air, on surfaces, and on objects, renders the property lost, unsafe, and unfit for its normal and intended usage. Respiratory particles (including droplets and airborne aerosols) and fomites are physical substances that alter the physical properties of the interiors of buildings to make them unsafe, untenable, and uninhabitable.

. . . .

69. Given the ubiquity and pervasiveness of the COVID-19 virus, no amount of cleaning or ventilation intervention will prevent a person infected and contagious with the COVID-19 virus from entering an indoor space and exhaling millions of additional COVID-19 virus particles into the air, further: (a) filling the air with aerosolized COVID-19 virus that can be inhaled, sometimes with deadly consequences; and (b) depositing COVID-19 virus particles on the surfaces, physically altering and transforming those surfaces into disease-transmitting fomites.

. . . .

76. Due to the prevalence of COVID-19 infections in the United States, Washington state, and globally, WSU's locations had consistently high risks that the COVID-19 virus was present in the air, on surfaces, or carried by WSU's infected students and staff members, some of whom would have been asymptomatic and unknowing spreaders of the COVID-19 virus.

. . . .

88. [Governmental orders], while appropriate and necessary measures to fulfill the Governor's obligation to protect the health of the public, impacted WSU's ability to serve its students, employees, and communities by prohibiting or limiting the use of insured property, designating such property unsafe for its intended use, requiring alterations to physical property, and dispossessing WSU of its physical property.

. . . .

93. In light of the number of employees, vendors, and students present at WSU's insured locations on a regular basis, how highly contagious the COVID-19 virus is, the reported rate of infection throughout the state of Washington, including in the vicinity of the insured locations, what is known about the reported rate of infection substantially undercounting the actual rate of infection in the early months of the Pandemic, and other factors, it is statistically certain or near certain that COVID-19 was actually present in each of WSU's insured locations beginning in early March, 2020.

. . . .

95. The COVID-19 Pandemic made it necessary for WSU to suspend operations, incur extra expense, and to undertake costly efforts to protect and preserve property from further damage or loss including making physical alterations to its property.

96. Examples of WSU's early suspension of its operations include the following: on March 11, 2020, WSU announced that all in-person instruction would end effective March 23, 2020 and implemented "remote learning" through the remainder of the spring semester; on March 17, 2020, Dining Services modified the availability of food options at its facilities to delivery and to-go only, ending in-person dining; on March 17, 2020 summer education abroad programs were cancelled and program fees were refunded; on March 22, 2020, all libraries on the Pullman campus were closed.

97. Services, events, and other aspects of WSU's operations that could not be conducted remotely were suspended completely, including sporting events.

98. The suspension of in-person instruction resulted in students staying home to attend school rather than returning to WSU's student housing, among other impacts.

. . . .

104. COVID-19, a communicable disease, and the presence of the COVID-19 virus in, on, and around insured locations caused direct physical loss or damage to WSU's property, leading to the necessary suspension of operations at insured locations, which has resulted in business income loss and other loss covered by the Policy's Time Element coverage.

. . . .

111.  COVID-19, a communicable disease, and the COVID-19 virus, also caused "direct physical loss" to insured property.

CP at 10-27 (boldface omitted) (internal footnotes omitted).

In its second amended complaint, WSU pled five causes of action: (1) a request for judgment declaring the Factory Mutual Insurance policy covered more losses than those losses covered by the interruption by communicable disease endorsement, (2) breach of contract, (3) common law bad faith, (4) violations of the insurance fair conduct act, and (5) violations of the Consumer Protection Act, ch. 19.86 RCW.  WSU asked for damages of not less than $63,068,573, subject to policy limits.

Factory Mutual filed a CR 12(c) motion for judgment on the pleadings.  In its motion, Factory Mutual argued that WSU's lawsuit mirrored other cases filed in Washington and in the United States wherein an insured party sought coverage for business loss due to the COVID-19 pandemic.  Factory Mutual asserted that courts, in the majority of those cases, particularly those in Washington, have dismissed the suit as a matter of law because losses due to the COVID-19 virus cannot cause *physical* loss or damage to property—a threshold requirement for coverage.  Moreover, even if a virus could cause physical loss or damage, its policy's contamination exclusion defeated coverage.

The superior court granted Factory Mutual's motion to dismiss. The court reasoned that: (1) the presence of the COVID-19 virus did not cause physical loss or damage to WSU's property, (2) even if the virus could cause such damage, the contamination exclusion barred coverage, and (3) WSU's extracontractual claims should be dismissed. According to the superior court, the virus did not physically alter any of WSU's property.

## LAW AND ANALYSIS

On appeal, WSU challenges the superior court's dismissal of its breach of contract, declaratory judgment, bad faith, and Consumer Protection Act claims. We conflate the declaratory judgment request with the contract claim because the former claim arises from the insurance contract. WSU concedes that, if the Factory Mutual policy did not cover its loss, it cannot recover for bad faith or under the insurance and consumer protection code. Because we rule that the Factory Mutual policy does not afford coverage, we do not address the other claims.

The question of whether WSU's temporary and partial loss of its facilities because of the COVID-19 pandemic constitutes "physical loss or damage" within the meaning of Factory Mutual's all-risk insurance policy governs this appeal. If we answer the question in the negative, we need not address Factory Mutual's alternative argument that the policy's contamination exclusion excludes coverage. Although some of its arguments are

11

subtler, WSU generally contends that it sufficiently pleaded, in its second amended complaint, that its loss constitutes "physical loss and damage." The transmittable COVID-19 virus became fomites that landed, if not attached or embedded, into its buildings surfaces and crannies thereby physically damaging the structures. Factory Mutual's contentions also hold more artfulness, but the insurance company generally insists that a "physical loss or damage" requires a physical effect on the property that demands repair or replacement. Factory Mutual highlights that WSU did not allege that any of its properties needed repair or replacement.

The parties cited in their briefs, and continue to cite in statements of additional authorities, a few Washington decisions, numerous foreign state decisions, and federal decisions based on diversity that address insurance coverage for business shutdowns related to the COVID-19 virus. We list, in an appendix, those decisions that we reviewed. Many of the decisions are unpublished, some are from Washington trial courts, and some have been vacated or reversed on appeal. The statements of additional authorities result from the numerous ongoing suits seeking insurance coverage for lost income and expenses resulting from the pandemic.

We expect all jurisdictions to shortly have controlling decisions from their highest courts that determine whether the presence of the COVID-19 virus inside a building constitutes physical damage or loss. More recent decisions discuss the phenomenon of

12

fomites, a focus of WSU's presentation to this court. *Tulalip Tribes of Washington v. Lexington Insurance Company*, 34 Wn. App. 2d 108 (2025); *Another Planet Entertainment LLC v. Vigilant Insurance Company*, 15 Cal. 5th 1106, 548 P.3d 303, 320 Cal. Rptr. 3d 843 (2024); *Starr Surplus Lines Insurance Company v. Eighth Judicial District Court in and for County of Clark*, 535 P.3d 254 (Nev. 2023). The increasing majority of the decisions deny coverage for such losses. *Hill & Stout PLLCv. Mutual of Enumclaw Insurance*, 200 Wn.2d 208, 224 (2022); *Verveine Corporation v. Strathmore Insurance Company*, 489 Mass. 534, 184 N.E.3d 1266, 1275-76 (2022). We, however, acknowledge two decisions that conflict with the prevailing view. *North State Deli LLC v. Cincinnati Insurance Company*, 908 S.E.2d 802 (N.C. 2024); *Huntington Ingalls Industries, Inc. v. Ace American Insurance Company*, 217 Vt. 195, 287 A.3d 515 (2022). Because of the numerous and increasing number of cases, a website tracks court decisions. *Covid Coverage Litigation Tracker,* INSURANCE LAW CENTER & UNIVERSITY OF PENNSYLVANIA CAREY LAW SCHOOL, https://cclt.law.upenn.edu (last visited July 16, 2025).

Often, if not usually, questions of insurance policy interpretation come before this court on motions to dismiss under CR 12(b)(6) for failure to state a claim in the complaint. WSU instead appeals from dismissal of its second amended complaint under CR 12(c), which authorizes motions for judgment on the pleadings.

We treat a CR 12(c) motion for judgment on the pleadings identically to a CR 12(b)(6) motion to dismiss for failure to state a claim. *P.E. Systems, LLC v. CPI Corp.*, 176 Wn.2d 198, 203, 289 P.3d 638 (2012); *Zurich Services Corp. v. Gene Mace Construction*, *LLC*, 26 Wn. App. 2d 10, 19, 526 P.3d 46 (2023). Both rules instruct the court to search whether a plaintiff can prove any set of facts that would justify relief. *Halvorson v. Dahl*, 89 Wn.2d 673, 574 P.2d 1190 (1978). The only practical difference between the two motions is timing. The defendant files a CR 12(b)(6) motion after the complaint but before the answer. *P.E. Systems, LLC v. CPI Corp.*, 176 Wn.2d 198, 203 (2012). The defense brings a CR 12(c) motion after closure of the pleadings. *P.E. Systems, LLC v. CPI Corp.*, 176 Wn.2d 198, 203 (2012).

On a CR 12(c) motion, like a CR 12(b)(6) motion, we accept factual allegations contained in the complaint as true. *Silver v. Rudeen Management Company*, 197 Wn.2d 535, 542, 484 P.3d 1251 (2021). When applying the CR 12 standard, we grant the plaintiff the benefit of all reasonable inferences from the factual allegations in the complaint and hypothetical facts consistent with the complaint. *Trujillo v. Northwest Trust Services, Inc.*, 183 Wn.2d 820, 830, 355 P.3d 1100 (2015).

Two rarely used principles loom important in this appeal. First, the court does not accept as true any unreasonable inferences. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). This principle should follow from the converse rule that we

14

adopt all reasonable inferences. Second, we do not accept legal conclusions as correct, even when couched as facts in the complaint. *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986); *Howell v. Department of Social & Health Services*, 7 Wn. App. 2d 899, 910, 436 P.3d 368 (2019). For this reason, we do not accept as true any allegation by WSU that the COVID-19 virus or fomites resulting from the virus caused physical loss or damage within the meaning of the Factory Mutual Insurance policy.

Decisions construing the language of an insurance policy obligatorily cite many rules of insurance policy interpretation, which rules echo principles of contract interpretation. The decisions then emphasize the rules that closely fit the context of the coverage dispute, while ignoring the rest.

Insurance coverage questions invoke a two-step process. *Graff v. Allstate Insurance Company*, 113 Wn. App. 799, 803, 54 P.3d 1266 (2002). First, the insured must prove that the policy covers its loss. *Graff v. Allstate Insurance Company.*, 113 Wn. App. 799, 803 (2002). We will construe an insurance policy to provide coverage whenever possible. *Seattle Tunnel Partners v. Great Lakes Reinsurance (UK) PLC*, 200 Wn.2d 315, 320, 516 P.3d 796 (2022); *Bordeaux, Inc. v. American Safety Insurance Company*, 145 Wn. App. 687, 694, 186 P.3d 1188 (2008). If the policy's inclusionary language extends to the insured's loss, the insurer must prove that specific policy

language excludes the insured's loss in order to avoid payment. *Graff v. Allstate Insurance Company*, 113 Wn. App. 799, 803 (2002).

We deem the interpretation of an insurance policy to be a question of law for the court. *Seattle Tunnel Partners v. Great Lakes Reinsurance (UK) PLC*, 200 Wn.2d 315, 320 (2022). We assume this principle denotes that a jury may resolve some underlying factual dispute between the parties, but the court solely determines the relationship between those facts and the language of the policy.

This court construes insurance policies as contracts. *Kut Suen Lui v. Essex Insurance Company*, 185 Wn.2d 703, 710, 375 P.3d 596 (2016); *Quadrant Corp. v. American States Insurance Company*, 154 Wn.2d 165, 171, 110 P.3d 733 (2005). Courts examine the terms of the policy to determine whether their plain meaning allows for coverage. *Kitsap County v. Allstate Insurance Company*, 136 Wn.2d 567, 576, 964 P.2d 1173 (1998). If the insurance policy defines terms, we interpret the policy in accord with the definition. *Kitsap County v. Allstate Insurance Company*, 136 Wn.2d 567, 576 (1998). We afford undefined terms with their plain, ordinary, and popular meaning. *Boeing Company v. Aetna Casualty & Surety Company*, 113 Wn.2d 869, 877, 784 P.2d 507 (1990); *Farmers Insurance Company v. Miller*, 87 Wn.2d 70, 73, 549 P.2d 9 (1976). To make that determination, courts may look to standard English dictionaries. *Kitsap*

*County v. Allstate Insurance Company*, 136 Wn.2d 567, 576 (1998).  We assume for this appeal that the popular meaning of terms coincides with the dictionary meaning.

Language in an insurance policy is ambiguous if the language is fairly susceptible to two different reasonable interpretations.  *American Star Insurance Company v. Grice*, 121 Wn.2d 869, 874, 854 P.2d 622 (1993), *supplemented*, 123 Wn.2d 131, 865 P.2d 507 (1994).  If the policy contains an ambiguity, the court may entertain extrinsic evidence of the parties' intent.  *Kitsap County v. Allstate Insurance Company*, 136 Wn.2d 567, 576 (1998).  If, after considering such evidence, the ambiguity still exists, courts should construe the ambiguity against the insurer.  *Kitsap County v. Allstate Ins. Company*, 136 Wn.2d 567, 576 (1998).

The Factory Mutual Insurance policy does not define "physical loss or damage." So, we look to the dictionary definition for each term for its plain or ordinary meaning. Merriam-Webster Dictionary defines "physical" as "having material existence: perceptible especially through the senses and subject to the laws of nature" or "of or relating to material things."  MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/physical (last visited March 25, 2025). "Loss" is defined, in relevant part, as "destruction, ruin."  MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/loss (last visited March 25, 2025).  "Damage" is defined as "loss or harm resulting from injury to person, property, or

17

reputation." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/damage (last visited March 25, 2025). Because of Washington precedent, we do not decide anew how these definitions apply to the loss of use of buildings resulting from the COVID-19 pandemic. We emphasize one definition of "physical" being "perceptible."

Words, as arbitrary symbols constructed by humans, never precisely fit reality. So, we cannot always point to an object and automatically declare that the object falls within a particular definition. In 2020 and 2021, this court could not have walked the halls of WSU and declared any building or portion of that building to have sustained physical loss or damage. Pictures from that surreal time also would not assist us. Some rules announced in case law may help us better understand, however, whether those university structures sustained physical damage or loss as a result of the epic pandemic.

To recover under a property insurance policy for physical loss of or damage to the property, something *physically* must happen to the property. *Hill & Stout PLLC v. Mutual of Enumclaw Insurance*, 200 Wn.2d 208, 222 (2022). "Loss" means that the alleged peril must set in motion events which cause the inability to physically own or manipulate the property, such as theft or total destruction. *Hill & Stout PLLC v. Mutual of Enumclaw Insurance*, 200 Wn.2d 208, 223 (2022). "Physical loss" does not equate to nonphysical loss of use. *Hill & Stout PLLC v. Mutual of Enumclaw Insurance*, 200

Wn.2d 208, 223 (2022). In short, the COVID-19 virus did not trigger direct physical loss

or damage. *Hill & Stout PLLC v. Mutual of Enumclaw Insurance*, 200 Wn.2d 208, 223

(2022). The COVID-19 virus and related government closures did not amount to "direct

physical loss of property." *Hill & Stout PLCC v. Mutual of Enumclaw Insurance*, 200

Wn.2d 208, 224 (2022). *See, e.g.*, *Verveine Corp. v. Strathmore Ins. Company*, 489

Mass. 534, 184 N.E.3d 1266, 1275-76 (2022). Government restrictions cannot

themselves physically alter property. *Hill & Stout PLLC v. Mutual of Enumclaw

Insurance*, 200 Wn.2d 208, 224 (2022).

The Supreme Court has not negated the possibility of a physical loss occurring

despite the lack of any physical alteration to the property under a loss of functionality

theory. *Hill & Stout PLLC v. Mutual of Enumclaw Insurance*, 200 Wn.2d 208, 221

(2022). But under such a theory, a contaminating substance must physically prevent use

of the property or render the property useless. *Hill & Stout PLLC v. Mutual of Enumclaw

Insurance*, 200 Wn.2d 208, 221-22 (2022).

"Physical loss or damage" does not encompass loss of use of functionality. *Seattle

Tunnel Partners v. Great Lakes Reinsurance (UK) PLC*, 200 Wn.2d 315, 320 (2022).

"Direct physical loss or damage" requires the deprivation or dispossession of or injury to

the insured property be physical. *Seattle Tunnel Partners v. Great Lakes Reinsurance

(UK) PLC*, 200 Wn.2d 315, 339 (2022). The loss must have a material existence, be

tangible, or be perceptible by the senses. *Seattle Tunnel Partners v. Great Lakes Reinsurance (UK) PLC*, 200 Wn.2d 315, 339 (2022).

WSU essentially claims a temporary loss of the intended use of the property. The all-risk insurance policy does not cover loss of use without more. *Hill & Stout PLLC v. Mutual of Enumclaw Insurance*, 200 Wn.2d 208, 225 (2022).

In *Hill & Stout PLLC v. Mutual of Enumclaw Insurance*, 200 Wn.2d 208 (2022), Hill and Stout PLLC (HS), a dental practice run by dentists Sarah Hill and Joseph Stout, purchased from Mutual of Enumclaw Insurance (MOE) an insurance policy that covered lost business income caused by physical loss or damage to the insured property. The policy included a virus exclusion. Under the virus exclusion, MOE would not cover "loss or damage caused directly or indirectly by . . . [a]ny virus . . . that induces or is capable of inducing physical distress, illness or disease." *Hill & Stout PLLC v. Mutual of Enumclaw Insurance*, 200 Wn.2d 208, 212-14 (2022).

Due to the COVID-19 pandemic, Sarah Hill and Joseph Stout, on March 18, 2020, closed the practice and ceased all routine dental procedures. A proclamation issued by this state's governor on March 19 limited the practice of dentistry to only emergency procedures until May 18. In that period of time, HS continued to operate both of its offices and perform emergency dental procedures therein. Receptionists present at both offices answered calls and rescheduled appointments.

The dental practice filed a complaint seeking a declaratory judgment that its MOE insurance policy covered the losses and expenses resulting from the interruption of business. HS's complaint alleged the insured property sustained direct physical loss of damage as a result of the proclamations and orders. MOE contended its insured suffered no direct physical loss of property.

On direct review, the Washington Supreme Court, in *Hill & Stout*, interpreted the phrase "direct physical loss of or damage to Covered Property." *Hill & Stout PLLC v. Mutual of Enumclaw Insurance.*, 200 Wn.2d 208, 219 (2022). The court affirmed summary judgment in favor of MOE. The court wrote:

> HS was still able to *physically* use the property at issue. The property was in HS's possession, the property was still functional and able to be used, and HS was not prevented from entering the property. Under the Proclamation, HS was not able to use the property in the way that it wanted, but this alleged "loss" is not "physical." It is more akin to an abstract or intangible loss than a "physical" one.

*Hill & Stout PLLC v. Mutual of Enumclaw Insurance*, 200 Wn.2d 208, 220 (2022). The Supreme Court decline to read any ambiguity into the policy language.

The policy dissected in *Hill & Stout PLLC v. Mutual of Enumclaw Insurance*, 200 Wn.2d 208, 221 (2022) employed the phrase "direct physical loss" rather than simply "physical loss or damage." The Factory Mutual Insurance policy omitted the word "direct." In many other cases, the policy language added the word "direct." We do not

21

discern any significance in our context with the addition of the word "direct." WSU does not argue the omission of the word "direct" distinguishes the Factory Mutual insurance policy from policies interpreted in other COVID-19 decisions.

WSU emphasizes that the COVID-19 virus or fomites remained in the air and adhered to surfaces. The Supreme Court of California rejected the idea that the COVID-19 virus causes direct physical damage to insured property by attaching to surfaces. *Another Planet Entertainment LLC v. Vigilant Insurance Co.*, 15 Cal. 5th 1106, 1148 (2024). According to the California court, allegations that the COVID-19 virus bonds to surfaces and changes their physical condition does not explain how the property was *physically* damaged or harmed by the presence of the virus. The court opined that microscopic bonds between the virus and a surface says little about the effect of such microscopic bonds on that surface. To constitute direct physical damage to property under California law, a tangible alteration of the property is *necessary* but not *sufficient*. An insured must allege, and later prove, that the alteration caused physical harm to the property. The alteration itself is not enough.

WSU argues that it sufficiently alleged in its second amended complaint that the COVID-19 virus caused "physical loss or damage" to the insured property in paragraphs 106 and 108 of its second amended complaint:

106. First, the presence of the COVID-19 virus physically transformed the content of the air in any insured location where it was present, rendering the air unsafe for individuals to breathe.

. . . .

108. Second, the COVID-19 virus caused direct physical damage to WSU's insured property by transforming physical objects, materials, or surfaces into 'fomites.' Because the COVID-19 virus can be spread by touching contaminated surfaces, fomites transform objects, materials, and/or surfaces and rendered such objects, materials, and/or surfaces at WSU's insured property unsafe for their intended purpose.

CP at 25. WSU further asserts that it supported its claim of physical loss or damage by citing research confirming that the virus latches to surfaces and objects, harming them, and physically changing and altering those objects by becoming part of their surface, making physical contact with them, and rendering them unsafe or unfit for their ordinary and customary use. Nevertheless, WSU has not alleged nor could it allege that the COVID-19 virus or the fomites physically prevented the use of its property.

WSU suspended in-person instruction and closed libraries on the insured property due to the actual or suspected presence of the COVID-19 virus. But portions of the insured property remained operating, usable, and inhabitable even in light of the virus' presence. For example, as alleged in WSU's complaint, the university suspended dine-in services on the insured property due to the virus, but the school continued to operate on the property by offering take-out or delivery options. These dining options reflect that occupants of the property continued to eat. WSU implemented frequent testing of staff

23

and students and added physical barriers in areas on the property. WSU would not have engaged in these activities or erected the modifications unless students and staff occupied the property. This continued use of the insured property demonstrates that the virus did not physically prevent the use of the property or render the property useless or inhabitable.

The COVID-19 virus itself did not shutter WSU. Rather the closure came because of students and staff coming in close contact in a closed atmosphere when the virus could spread from person to person. The risks of human harm from the virus and its transmission reflect the reality that the virus harmed humans, not property. The virus risk depended on people's presence in the property rather than from any harm to or defect in the property. The virus did not remain on the property but rather dissipated on its own.

Division One of this court addressed the same issue in *Tulalip Tribes of Washington v. Lexington Insurance Company*, 34 Wn. App. 2d 108 (2025). Division One came to the same conclusion while also noting that *Hill & Stout PLLC v. Mutual of Enumclaw Insurance*, 200 Wn.2d 208 (2022) controlled resolution of the appeal.

Finally, WSU argues that Washington has adopted the context rule for interpreting contracts and, under that rule, this court should consider extrinsic evidence concerning the circumstances of formation of the contract to ascertain the parties' intent. WSU then

contends that extrinsic evidence supports the conclusion that the Factory Mutual

Insurance policy covers loss due to a virus.

Factory Mutual argues that WSU overextends this state's context rule in an

attempt to get the insurance policy to say what the university wants it to say. According

to Factory Mutual, WSU alleges facts immaterial under the context rule because it relies

on evidence that does not concern the parties' mutual intent.

We reiterate that Washington courts treat insurance policies as contracts. *Kut

Suen Lui v. Essex Insurance Company*, 185 Wn.2d 703, 710 (2016); *Quadrant Corp. v.

American States Insurance Company*, 154 Wn.2d 165, 171 (2005). We primarily seek to

ascertain the mutual intent of the parties at the time they executed the contract. *Viking

Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 706, 712, 334 P.3d 116 (2014). Under

the "context rule," which Washington courts apply to interpret contracts, this court may

consider extrinsic evidence regarding the entire circumstances under which the parties

entered the contract to determine the parties' mutual intent. *Berg v. Hudesman*, 115

Wn.2d 657, 667, 801 P.2d 222 (1990); *Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 695

(1999). This court may consider such evidence regardless of whether the language in the

contract is ambiguous. *Safeco Insurance Company of Illinois v. Automobile Club

Insurance Company*, 108 Wn. App. 468, 478, 31 P.3d 52 (2001). The context rule does

25

not allow for consideration of evidence of a party's unilateral or subjective intent. *Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 695 (1999).

WSU first cites extrinsic evidence that Factory Mutual, in other litigation, has admitted that "physical loss or damage" is "ambiguous" and must be construed against it. CP at 5. According to WSU, that admission alone should have allowed this matter to proceed to discovery. Second, WSU asserts that extrinsic evidence in the form of Factory Mutual's intentional choice as the drafter of the insurance policy to not include a virus exclusion in the all-risk policy indicates an intent to cover losses caused by the presence of a virus on the insured premises. Finally, WSU relies on extrinsic evidence that, in litigation occurring prior to the COVID-19 pandemic, Factory Mutual argued that "physical loss or damage," when undefined in an all-risks policy like WSU's, includes loss of use of insured property. Based on this extrinsic evidence, WSU argues that the parties mutually intended, when forming the contract, for "physical loss or damage" to cover loss of use caused by a communicable disease.

As Factory Mutual correctly argues, none of the extrinsic evidence WSU forwards pertains to mutual intent. Instead, the evidence demonstrates only one party's intent— Factory Mutual's. Because the context rule does not permit consideration of evidence of one party's unilateral or subjective intent, we reject WSU's argument.

26

No. 40093-0-III
*Wash. State Univ. v. Factory Mutual Ins. Co.*

CONCLUSION

We affirm the trial court's grant to Factory Mutual of judgment on the pleadings

pursuant to CR 12(c).

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Murphy, J.

_____
Cooney, J.

27

No. 40093-0-III
*Wash. State Univ. v. Factory Mutual Ins. Co.*

APPENDIX OF CASES

**Washington Supreme Court**

*Seattle Tunnel Partners v. Great Lakes Reinsurance (UK) PLC*, 200 Wn.2d 315, 516 P.3d 796 (2022)

*Hill & Stout PLLC v. Mutual of Enumclaw Insurance Co.*, 200 Wn.2d 208, 515 P.3d 525 (2022)

**Washington Court of Appeals**

*Tulalip Tribes of Washington v. Lexington Insurance Co.*, 34 Wn. App. 2d 108, 566 P.3d 149 (2025)

*Graff v. Allstate Insurance Co*, 113 Wn. App. 799, 54 P.3d 1266 (2002)

*Quest Diagnostics Inc. v. AIG Specialty Insurance Co.*, No. 85285-0-I, 2024 WL 2744058, (2024) (unpublished)

**Washington Superior Court**

*The Board of Regents of the University of Washington v. Employers Insurance Co. of Wausau*, No. 22-2-15472-1 (King County Super. Ct. Feb. 26, 2024)

*Perry Street Brewing Co. v. Mutual of Enumclaw Insurance Co.*, No. 20-2-02212-32, 2020 WL 7258116 (Spokane County Super. Ct., Wash. Nov. 23, 2020)

**United States Circuit Court of Appeals**

*Port Authority of New York & New Jersey v. Affiliated FM Insurance Co.*, 311 F.3d 226, 231 (3d Cir. 2002)

*Brown Jug, Inc. v. Cincinnati Ins. Co.*, 27 F.4th 398 (6th Cir. 2022)

*Worthy Hotels, Inc. v. Fireman's Fund Ins. Co.*, No. 21-35495, 2024 WL 2182838 (9th Cir. May 15, 2024) (unpublished)

No. 40093-0-III
*Wash. State Univ. v. Factory Mutual Ins. Co.*


*Another Planet Entertainment, LLC v. Vigilant Insurance Co.*, 56 F.4th 730 (9th Cir. 2022)

*Monarch Casino & Resort, Inc. v. Affiliated FM In Co.,* 85 F.4th 1034 (10th Cir. 2023)

## United States District Court

*Live Nation Entertainment, Inc. v. Factory Mutual Insurance Co.*, No. 21-00862 (C.D. Cal. Oct. 8, 2024)

*Sacramento Downtown Arena LLC v. Factory Mut. Ins. Co.*, No. 2:21-CV-00441-KJM-SCR, 2024 WL 4534152 (E.D. Cal. Oct. 21, 2024), *appeal docketed*, No. 24-7165 (9th Cir. Nov. 27, 2024)

*Washington State Convention Center Public Facilities District v. Employers Insurance Co. of Wausau*, No. 2:23-CV-1386-BJR, 2024 WL 810692 (W.D. Wash. Feb. 27, 2024), *appeal docketed*, No. 24-1889 (9th Cir. Mar. 28, 2024)

*Cardish Cos., Inc. v. Affiliated Factory Mutual Insurance Co.,* 573 F. Supp. 3d 977 (D. Md. 2021), *aff'd*, No. 21-2055, 2022 WL 1114373 (4th Cir. Apr. 14, 2022)

*Dr. Jeffrey Milton, DDS, Inc. v. Hartford Casualty Insurance Co.*, 588 F. Supp. 3d 266 (D. Conn. 2022)

*Nguyen v. Travelers Casualty Insurance Company of America*, 541 F. Supp. 3d 1200 (W.D. Wash. 2021)

*Byberry Services & Solutions, LLC v. Mt. Hawley Insurance Co.*, No. 20-6 CV-03379, 2021 WL 3033612 (N.D. Ill. July 19, 2021)

*First & Stewart Hotel Owner, LLC v. Fireman's Fund Ins. Co.*, No. 2:21-CV-00344-BJR, 2021 WL 3109724 (W.D. Wash. July 22, 2021)

29

No. 40093-0-III
*Wash. State Univ. v. Factory Mutual Ins. Co.*

**Other States**

*Another Planet Entertainment, LLC v. Vigilant Insurance Co.*, 15 Cal. 5th 1106 (2024)

*Endeavor Operating Co., LLC v. HD! Global Insurance Co.*, 96 Cal. App. 5th 420, 313 Cal. Rptr. 3d 746 (2023)

*San Jose Sharks, LLC v. Superior Court*, 98 Cal. App. 5th 158 316 Cal.Rptr.3d 393 (2023)

*United Talent Agency v. Vigilant Insurance Co.*, 77 Cal. App. 5th 821, 293 Cal. Rptr. 3d 65, (2022)

*Marina Pacific Hotel & Suites, LLC v. Fireman's Fund Insurance Co.*, 81 Cal. App. 5th 96, 296 Cal. Rptr. 3d 777 (2022)

*Shusha, Inc. v. Century-National Insurance Company*, 87 Cal. App. 5th 250, 303 Cal. Rptr. 3d 100 (2022)

*Mashantucket Pequot Tribal Nation v. Factory Mutual Insurance Co.*, 224 Conn. App. 429 (2024)

*Connecticut Dermatology Group, PC v. Twin City Fire Ins. Co.*, 288 A.3d 187 (Conn. 2023)

*Verveine Corp. v. Strathmore Insurance Co.*, 489 Mass. 534, 184 N.E.3d 1266 (2022)

*Starr Surplus Lines Insurance Co. v. Eighth Judicial District Court in and for County of Clark*, 535 P.3d 254 (Nev. 2023)

*Schleicher & Stebbins Hotels, LLC v. Starr Surplus Lines Insurance Co.*, 302 A.3d 67 (N.H. 2023)

*North State Deli, LLC v. Cincinnati Ins. Co.*, 908 S.E.2d 802 (N.C. 2024)

No. 40093-0-III
*Wash. State Univ. v. Factory Mutual Ins. Co.*


*Cato Corp. v. Zurich Am. Ins. Co.*, 909 S.E.2d 144 (N.C. 2024)

*Ungarean v. CNA & Valley Forge Ins. Co.*, 323 A.3d 593 (Pa. 2024)

*Huntington Ingalls Industries, Inc. v. Ace American Insurance Company*, 217 Vt. 195, 287 A.3d 515 (2022)

31